## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| DR. JASMINE YOUNGE, | § | |
| | § | |
| *Plaintiff*, | § | CIVIL ACTION NO. |
| | § | 1:20-cv-00684-WMR-CMS |
| v. | § | |
| | § | |
| FULTON JUDICIAL CIRCUIT | § | |
| DISTRICT ATTORNEY'S OFFICE, | § | |
| GEORGIA, | § | |
| | § | |
| *Defendants*. | § | |
| | § | |

## DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

For the following reasons and under Fed. R. Civ. P. 56, there is no genuine question of material fact that Plaintiff's claims under Title VII for pregnancy discrimination and retaliation are not viable as a matter of law and should be dismissed with prejudice.

### I. INTRODUCTION

After the Court's ruling on Defendant's Motion to Dismiss, [Doc. 52], the only remaining claims from Plaintiff's Amended Complaint, [Doc. 31], were, (1) pregnancy discrimination under Title VII, and (2) retaliation under Title VII.

These claims both fail as the undisputed material facts show that Plaintiff was not an "employee" under Title VII. And even if Plaintiff had met the definition of an

employee, which she does not, the undisputed facts show that she was neither discriminated against for her pregnancy or retaliated against in violation of Title VII.

## II.    SUMMARY OF FACTS

Younge has claims under Title VII for pregnancy discrimination and retaliation.

Younge was interviewed by former district attorney Paul Howard and offered a job in April 2019. She began work at the DA's Office on May 1, 2019, as the Deputy Chief of Staff and the Director of Policy and Programs. [Stmt. of Facts 1]. She worked at the DA's Office for only two months.

Younge's salary was set at $120,282.00. [*Id.*]. It was able to be set this high because Howard had exclusive funding available for personal staff. [*Id.* 2]. Younge's duties included supervising more than 30 employees over more than seven departments at the DA's Office, implementing policies, working as the principal drafter of criminal justice policy, and working closely with the DA every day. [*Id.* 4-13].

Younge was only accountable to Howard and was number three in the chain of command. [*Id.* 3, 12, 21]. Plaintiff worked with community leaders and dignitaries and represented the DA's Office in the eyes of the public. [*Id.* 9-10]. Younge met with Howard all day, every day. [*Id.* 13, 17]. She was with Howard constantly and was involved in everything the DA's Office did. [*Id.* 13-20]. Younge was with Howard all the time and her work relationship with Howard was intimate. [*Id.*]. Younge held a sensitive position of trust and confidence.

During the two months that Younge worked at the DA's Office, there were many complaints about her behavior made by co-workers. [*Id.* 23-33]. The complaints were either made to Howard or his Chief of Staff, Lynne Nelson. [*Id.*]. Beyond the

complaints, Younge treated Howard "appallingly" in staff meetings and had serious performance issues. [*Id.*]. After an incident where Howard witnessed Plaintiff mistreating an attorney on his staff, the decision was made to terminate her. [*Id.* 33-36]. This decision was made at the end of June 2019, before Plaintiff told Howard about her pregnancy. [*Id.*]. Plaintiff told Howard about her pregnancy in a letter on July 1, 2019. [*Id.* 37].

Plaintiff was terminated on July 15, 2019. She was terminated before she had made any complaints about Howard or filed any charges of discrimination. [*Id.* 40-44].

## III.   ARGUMENT

### A. Summary Judgment Standard

### DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON ALL OF PLAINTIFF'S CLAIMS

Summary judgment is appropriate when there is no genuine issue of material fact, such that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998). A plaintiff must produce "significant probative evidence tending to support the complaint" or provide "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Conclusory allegations and self-serving assertions will not suffice. *See Earley v. Champion Intíl Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000). To be material, a fact must be identified by the controlling substantive law as an

essential element of the non-moving party's case. *Anderson*, 477 U.S. at 248.

**B. <u>42 U.S.C. § 2000e</u> *et seq.* <u>– TITLE VII OF THE CIVIL RIGHTS ACT OF 1964</u>**

Title VII makes it unlawful for an employer to discriminate against an individual because of her "race, color, religion, or national origin." 42 U.S.C. § 2000e-2(a)(1). Only plaintiffs who meet Title VII's definition of an "employee" may bring a Title VII suit. *Llampallas v. Mini-Circuits, Inc.*, 163 F.3d 1236, 1242-43 (11th Cir. 1998). Congress included several exclusions to the definition of "employee." The exclusions include those on the "personal staff" of an elected official and "policymakers" who work for an elected official. 42 U.S.C. § 2000e(f). If Plaintiff falls within the definition of an elected official's personal staff, then both claims fail.

**1. <u>42 U.S.C. § 2000e(f) - Title VII's Exception for the Personal Staff of an Elected Official.</u>[1]**

The undisputed material facts decisively show that Plaintiff was on the District Attorney's personal staff.  According to Title VII, the term "employee" means:

> an individual employed by an employer, except that ***the term "employee" shall not include any person elected to public office in any State… or any person chosen by such officer to be on such officer's personal staff***, or an appointee on the policymaking level… The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws [2]…

---

[1] The District Attorney for a judicial circuit is an elected position in Georgia. See O.C.G.A. § 15-18-3(1).

[2] Plaintiff was not subject to civil service laws. The term "civil service laws" refers to a personnel system where employees can only face termination for cause. *See e.g.*, 29 C.F.R. § 553.11(c). In 1996, the Merit System Reform Act was passed in Georgia. The Act makes every new hire "unclassified" and not subject to civil service laws. O.C.G.A. § 45-20-1 *et seq.*; see also, Ga. Atty. Gen., Official Opinion 2006-3, Oct. 16, 2006. Because Plaintiff was hired in 2019, she was not subject to civil service laws.

42 U.S.C. § 2000e(f).

Title VII does not define "personal staff." Courts, however, look to the "nature and circumstances of the employment relationship between the complaining individual and the elected official to determine if the exception applies." *Teneyuca v. Bexar Cty.*, 767 F.2d 148, 151 (5th Cir. 1985).

*Teneyuca* is the leading case on Title VII's personal staff exception. At least the Third, Fourth, Fifth, Sixth, Eighth, and Tenth Circuits have adopted the *Teneyuca* six-factor balancing test, along with several district courts in the Eleventh Circuit.[3]

The *Teneyuca* balancing test applies six factors to determine whether an individual is a member of an elected official's "personal staff":

> (1) Whether the elected official has plenary powers of appointment and removal,
> (2) Whether the person in the position at issue is personally accountable to only that elected official,
> (3) Whether the person in the position at issue represents the elected official in the eyes of the public,
> (4) Whether the elected official exercises a considerable amount of control over the position,
> (5) The level of the position within the organization's chain of command, and,
> (6) The actual intimacy of the working relationship between the elected official and the person filling the position.

*Id.* Many courts have found the sixth factor carries the most weight. *Id.* at 152; *Owens v. Rush*, 654 F.2d 1370, 1375 (10th Cir. 1981). As a balancing test, however, courts do not require that a defendant satisfy each element of the test; it must only be shown

---

[3] *See e.g., Laurie v. Ala. Ct. of Criminal App.*, 88 F. Supp. 1334, 1338 (M.D. Ala. Mar. 15, 2000), *aff'd*, 256 F.3d. 1266 (11th Cir. 2001); *Hemminghaus v. Missouri*, 756 F.3d 1100, 1108 (8th Cir. 2014); *Birch v. Cuyahoga Cty. Probate Ct.*, 392 F.3d 151, 158 (6th Cir. 2004); *Gunaca v. Tex.,* 65 F.3d 467, 470 (5th Cir. 1995); *Townsend v. Shook*, 323 Fed. Appx. 245, 249-250 (4th Cir. 2009).

that, on balance, the factors favor the exception.

The undisputed material facts show that each element of the test heavily favors the conclusion that Younge was a member of the DA's personal staff. Much of the evidence comes directly from Younge's testimony. So, while the exception is narrow and the inquiry is highly factual, summary judgment is always appropriate when there is no genuine issue of material fact as to the applicability of the relevant factors. See *Teneyuca*, *supra*; *Birch*, 392 F.3d at 158.

> ### i. <u>Whether the elected official has plenary powers of appointment and removal.</u>

Under Georgia law, the elected district attorney directly controlled the decision to appoint Younge to his personal staff; he also controlled the decision to terminate her employment. According to O.C.G.A. §§ 15-18-19(b) and 15-18-20.1, personnel employed by the DA have their duties and responsibilities assigned by the DA and serve at the DA's pleasure. Howard had sole and absolute authority to appoint someone to his personal staff. [Doc. 104-4, Ex. A Howard Decl. ¶ 2; Doc. 95, Howard Dep. 82, 85, 105, 107]. Howard interviewed Younge and offered her the job of Deputy Chief of Staff and Director of Policy and Programs. [Doc. 93, Younge Dep. 24; Doc. 104-4, Ex. A Howard Decl. ¶ 3; Ex. A-1, Job Description; Ex. A-2, interview sched.]. Younge's employment offer stated, "appointment and approval [are] subject to the pleasure and discretion of the District Attorney." [Doc. 104-4, Ex. A-3, employment offer].

Courts have found the first *Teneyuca* factor is satisfied by a statute that authorizes an elected official to appoint or terminate those who serve them. These statutes are substantively identical to O.C.G.A. §§ 15-18-19(b) and 15-18-20.1. For

example, in *Gunaca v. Texas*, the court found the first factor satisfied by a Texas statute that gave DAs discretion to appoint personnel. 65 F.3d 467, 471 (5th Cir. 1995). In *Taplin v. Johnson*, the court held a state law that gave sheriffs the power to hire and remove personnel satisfied the first element. 90 Fed. Appx. 736, 739 (5th Cir. 2004). And in *Dubisar-Dewberry v. District Att'y's Off.*, the court held the first factor was satisfied under an Alabama statute virtually identical to Georgia's. 927 F.Supp. 1479, 1484 (M.D. Ala. Mar. 28, 1996).

DA Howard's plenary authority was exercised here. Howard decided to appoint Plaintiff to his personal staff and went through the unique process to obtain funding for a personal staff member. Later, the decision to terminate was made solely by Howard. [Doc 95, Howard Dep. 82, 85, 105, 107].

Since Georgia law granted Howard sole authority to appoint and terminate members of his personal staff— and because Howard exercised those powers— the first factor squarely favors the personal staff exception.

ii.     **Whether the person in the position at issue is personally accountable to only that elected official.**

Younge testified that she was only accountable to Howard. [Stmt. of Facts 12]. Younge testified in detail about her close working relationship with Howard:

- she met with DA Howard every day, [*Id.* 8, 13-14];
- if the DA "needed something done, I would handle it", [*Id.* 16];
- she would discuss the progress of initiatives she was overseeing with Howard, "All day every day," [*Id.* 17];
- she had meetings with Howard "all the time" and, as a member of his personal staff, she "was in and out of his office because [the personal staff] were…the essential folks," [*Id.* 18-21];
- she did not need to make appointments to see Howard because she "was literally his go-to person for almost everything," and she was "one of the few on staff that

was just able to walk into his office at any time," [*Id.*]; and,

- "most folks would need to schedule an appointment or… would request to see him through his executive assistant. But I had kind of an open-door access to him," [*Id.*].

Howard was Younge's immediate supervisor; he "supervised [Younge] more personally and directly…"; and "[he] considered [Younge to be a member of his] personal staff." [*Id.* 21]. Younge had "complete access to [Howard's] office," and "several times a day" Younge would "walk into [Howard's] office" to discuss the day's agenda; "at the end of the day [Younge and Howard] would generally sort of summarize what had gone on that day and what [they] were planning to do the next day or in the immediate future." [Doc. 95, Howard Dep. 28]. Other personal staff also recognized that Younge was a member of Howard's personal staff, and that Howard was Younge's only supervisor. [Doc. 94, Nelson Dep. 30, 39].

Further, Younge's salary was $120,282.00. Younge received a salary just below Howard's because there was exclusive funding available for members of his personal staff. [Doc. 104-4, Ex. A Howard Decl. ¶ 4]. To secure the funding, Howard had to sign an Oath stating that (1) he reviewed Fulton County's definition of personal staff,[4] (2) that Plaintiff's position met that definition, and (3) that Plaintiff would be a member of his personal staff. [*Id.* 2]. Howard had to swear that he would be Younge's only supervisor and that she would have personal accountability only to him. [*Id.*]. See also, O.C.G.A. §§ 15-18-19(b) and 15-18-20.1 (stating the DA sets the staff's duties and

---

[4] Fulton Co. defines "Personal staff of elected officials" as "any person who is chosen, appointed and/or hired by a person elected to public office… to be on such elected official's personal staff and who is directly supervised and personally accountable to only that elected official." The person on the personal staff must not be subject to civil service laws. Fulton County Personnel Policies and Procedures, FultonCounty.gov (Apr. 4, 2022, 12:11 PM).

responsibilities).

Younge and Howard's testimony and the facts surrounding Younge's appointment to Howard's personal staff, all show that factor two of the *Teneyuca* balancing test strongly favors the personal staff exception.

### iii.   <u>Whether the person in the position at issue represents the elected official in the eyes of the public.</u>

Many courts have recognized that elected officials are judged by the public based on the job done and impressions made by their first line of advisors. Thus, an elected official is judged by the voters based on the actions of his personal staff.

Plaintiff oversaw the DA's policies and programs and supervised more than thirty employees across seven departments within the DA's Office. [Stmt. of Facts 7]. Plaintiff met with any dignitaries or members of the public that came into the office to meet with the DA. [*Id.* 9]. Plaintiff met with community leaders on the DA's behalf. [*Id.*].   Plaintiff testified that she was "in contact with a lot of persons in the community on behalf of the DA's Office." [Doc. 93, Younge Dep. 39].

Plaintiff was, more than any other member of Howard's personal staff, the person who represented the DA in the public's eyes. [Stmt. of Facts 10]. Plaintiff played the leading role in every program, policy, or meeting that involved the public. [*Id.* 9-11]. Plaintiff would have to deal with the public directly when there was "a specific case that's outstanding that's, you know, getting some public attention." [Doc. 104-4, Ex. A Howard Decl. ¶¶ 5, 7; Doc. 93, Younge Dep. 36-39]. And Plaintiff supervised 15-20 projects and related policy matters; each of these policies and programs Plaintiff oversaw was a representation of the job that DA Howard was doing in the eyes of the

community. [Stmt. of Facts 9-11].

In *Dubisar-Dewberry v. Dis. Atty's Off.*, the court found the third factor satisfied where the plaintiff, a child support coordinator, interviewed members of the public, coordinated activities in the county related to child support, and was known to residents of the community as the person who oversaw the child support program for the office of the district attorney. 927 F.Supp. 1479, 1485 (M.D. Ala. Mar. 28, 1996).

In *Townsend v. Shook*, a chief deputy at a sheriff's department was held to be a member of the sheriff's personal staff. 323 Fed.Appx. 245, 249 (4th Cir. 2009). The court found that the plaintiff represented the elected sheriff in the eyes of the public because she stood in the sheriff's shoes when she issued directives to staff members she supervised and because she was "the policy administrator" for the sheriff's office, "heavily involved in drafting policy and in making sure that such policies were carried out." *Id.*

The undisputed material facts here are analogous to both *Dubisar-Dewberry* and *Shook*. Like Dubisar-Dewberry, Plaintiff interacted with members of the public and coordinated outreach programs in the community. Further, as Howard's top-line advisor and Director of Policies and Programs, residents of the community would attribute the policies and initiatives she oversaw to Howard. And like the deputy sheriff in *Shook*, Plaintiff represented the DA when she supervised over thirty staff members spread over seven departments. [Stmt. of Facts 7]. In Plaintiff's recording of a conversation between herself and Howard, she states, "remember you ("you," meaning Howard) told me that I represent you [when I'm dealing with staff members]." [Exhibit C, electronic recording at approx. 4:20 (USB drive filed manually)]. And like

the chief deputy in *Shook*, Plaintiff, as the Deputy Chief of Staff and Director of Programs and Policies, drafted policy and ensured that the policies were carried out. [Stmt. of Facts 5, 15, 22].

There is no genuine question of material fact that Plaintiff represented the DA in the eyes of the public. This factor also establishes that Plaintiff was a member of the DA's personal staff.

iv.   **Whether the elected official exercises considerable control over the position.**

This factor is similar in many respects to the second. Plaintiff's testimony discussed in section (ii), applies equally here. Plaintiff's statements are direct evidence of the control Howard exercised over his Deputy Chief of Staff and Director of Policy and Programs.

Plaintiff testified that Howard was "very involved [in the policies and programs Plaintiff oversaw ]… [Howard] made it a point to be involved in every single thing…" [Stmt. of Facts 14-15, 19]. Howard testified that Plaintiff was "a key member of my personal staff. I asked her to head what I thought was one of the most important units in the office that had bearing on criminal justice in the entire country." [Doc. 95, Howard Dep. 110].

In *Gunaca v. Texas*, the court emphasized that the fourth factor looks at the degree of control an elected official "actually exerts over the [plaintiff's] day-to-day activities." 65 F.3d 467, 471 (4th Cir. 1995). The *Gunaca* plaintiff was an investigator at a district attorney's office. *Id.* at 471. The court found Gunaca was a member of the DA's personal staff, where he "spoke to the former district attorney 'practically every

day.'" *Id.* Gunaca "would discuss certain activities and [ ] investigation activities with [the DA]…" *Id.* The *Gunaca* court determined that the case lent itself to disposition by summary judgment so well because "most of the necessary facts are provided by statute or by [the plaintiff's] testimony and summary judgment evidence." *Id.* at 473.

In *Taplin v. Johnson*, the fourth element was held satisfied where the plaintiff conceded that she and the elected sheriff "worked very closely together" "in all aspects of her job," and that she "consulted" and "tried to coordinate everything with the sheriff." 90 Fed. Appx. 736, 740 (5th Cir. 2004). The court also recognized the importance of the sheriff deciding what the plaintiff would work on. *Id.*

Both *Gunaca* and *Taplin* stand on all fours with our undisputed material facts. According to Younge, Howard was more involved in her work than what, in *Taplin*, the court said was "a considerable amount of control." *Id.* Younge testified she was Howard's "go-to person" and that "if he needed something done I would handle it," [Stmt. of Facts 16]; that she met with DA Howard every day, [*Id.* 13, 17]; Younge discussed the DA's program initiatives with Howard "[a]ll day every day," including on weekends, [*Id.* 17-19]. Younge spoke about the intimate nature of Howard's work with his personal staff, and how the personal staff was made up of only the "essential folks." [*Id.* 18-19]. Younge met with DA Howard "all the time," [*Id.* 13-14, 17-22], and Howard directly set the agenda for the policies and programs that Younge worked on. [*Id.* 8].

Like *Gunaca*, determining that Younge was on Howard's personal staff is particularly well suited for summary judgment because most of the undisputed material facts are provided by Younge's testimony.

Here again, the weight of evidence, namely Younge's testimony, meets all the

essential criteria of the personal staff exception.

v.    **The level of the position within the organization's chain of command.**

The undisputed material facts before the Court show that Plaintiff filled a position directly below DA Howard in the chain of command. Plaintiff was considered third in the chain of command for the entire DA's Office. [Doc. 95, Howard Dep. 41–42].

The job description for the Deputy Chief of Staff and the Director of Policy and Programs set forth many of Younge's duties, including:

- overseeing the administrative division of the DA's Office,
- "policy implementation and development, management and oversight of bureaus, strategic communications, and responsive constituent services,"
- "[p]rincipal writer of Criminal Justice and Crime Prevention policies and programs," as well as "[d]evelop[ing], implement[ing], and administer[ing] Criminal Justice and Crime Prevention programs."
- supervising more than thirty employees in more than seven departments across the DA's Office;
- collecting criminal justice data "at the direction of the DA," and
- to "[w]ork closely with the DA on a daily basis."

[Doc. 104-4, Ex. A-1, job description].

Plaintiff testified that she was in every meeting for "any and every project that had to do with the DA's Office," that "[a]ny dignitaries or anybody – any visitors that came to the Office and had meetings with the DA, I was in. Sometimes that was in addition to the chief of staff and sometimes that was without her… pretty much the schedule that DA Paul Howard had, was my schedule." [Stmt. of Facts 14]. Younge testified that she was literally involved in "anything" that had to do with the DA's Office. [*Id.* 16-22]. When asked, "[s]o you were basically involved with everything the

district attorney's office did?", Younge replied, "[p]retty much, yes." [*Id*.].

Finally, Younge stated she was "literally [DA Howard's] go-to person for almost everything," and was one of two or three people in the entire Office high enough to always have full access to DA Howard. [Doc. 93, Younge Dep. 68]. Howard testified that Younge was a "key member of my personal staff" and "a high-ranking part of my staff, [and] that is certainly what I considered her." [Doc. 95, Howard Dep. 110, 21-23].

Another factor confirming Younge's status at the top of the organization's chain of command was her salary. In earning a salary of $120,282.00, Younge was the second or third highest-paid staff member at the DA's Office, just under Howard's salary. [Doc. 104-4, Ex. A Howard Decl. ¶ 9; Ex. A-3 job offer].

Plaintiff's intimate and highly sensitive position of trust working with Howard, her role supervising over thirty employees, and her top-tier salary all support the fact that Plaintiff was a member of DA Howard's personal staff. Factor five too weighs firmly in favor of the personal staff exception.

### vi.   <u>The actual intimacy of the working relationship between the elected official and the person filling the position.</u>

The evidence, Younge's testimony, Howard's testimony, and common sense, all conclusively show that Younge and Howard's working relationship was highly intimate and that Younge held a sensitive position of trust and confidence. Since— as Younge put it— she was involved in everything the DA's Office did, including each project and policy the DA was pursuing, Howard worked closely with her and needed trust and confidence in her abilities since he knew the voters would judge him for the quality of the work she performed. [Doc. 93, Younge Dep. 36–37, 38–39, 40, 42; Doc.

95, Howard's Dep. 21–23, 28; Doc. 104-4, Ex. A Howard Decl. ¶ 7].

While there is case law that discusses a plaintiff working with an elected official daily,[5] none involved an arrangement this intimate, where Younge interacted with the DA "[a]ll day every day." [Stmt. of Facts ¶ 17]. It was this kind of intimate working relationship, first-line advisor, and sensitive position of trust, that Congress contemplated when the personal staff exception was signed into law. *See e.g., Teneyuca*, 767 F.2d at 152 (finding that Congress intended for the personal staff exception to apply to individuals in highly intimate and sensitive positions of responsibility on the elected official's staff).

If the Court determines Younge meets the criteria for the personal staff exception, both claims fail. There is no genuine question of material fact that the *Teneyuca* factors are satisfied and no reasonable jury could disagree with the conclusion that Younge was a member of Howard's personal staff. As a result, summary judgment is appropriate and the claims against the DA's Office should be dismissed with prejudice.

## 2. <u>42 U.S.C. § 2000e(f) - Title VII's Exception for Appointees on a Policy-Making Level</u>

The Eleventh Circuit has not directly addressed the policy-making exception. The exception states:

> an individual employed by an employer, except that **the term "employee" shall not include any person elected to public office in any State... or** an appointee on the policymaking level...

---

[5] See e.g., *Taplin v. Johnson*, 90 Fed.Appx. at 739-740; *Williams v. Glover*, No. 1:03-CV-1097-WKW, 2006 WL 861353, at *7 (M.D. Ala. Mar. 31, 2006); see also, *Dubisar-Dewberry v. Dis. Atty's Off.*, 927 F.Supp. at 1485-86 (holding that the personal staff exception applied even where the plaintiff did not have day-to-day contact with the elected official).

42 U.S.C. § 2000e(f). Several other circuits, however, have adopted analytical factors:

> (1) Whether the appointee had discretionary rather than solely administrate powers;
> (2) Whether the appointee served at the pleasure of the elected official who made the appointment; and
> (3) Whether the appointee formulated policy.

*Watts v. Bibb Cnty., Ga.*, 5:08-CV-413 (CAR), 2010 WL 3937397, at *9 (M.D. Ga. Sept. 30, 2010).

Factor two is adequately addressed in Section B(1)(i), *supra*. State law in Georgia expressly states that Plaintiff served at the pleasure of the DA. O.C.G.A. §§ 15-18-19, 15-18-20.1.

"In analyzing these factors, the Court looks to what is required of the position itself, not necessarily the specific duties undertaken by the individual." *Watts* at *9. "High level personnel who appear for and help fulfill the duties of the elected official, and who, by virtue of their job titles could potentially be required to work closely with the elected official, regardless of whether they actually did or not, should fall within the policymaking exemption." *Id.*

As to the first factor, the inquiry looks to the "inherent powers of the position occupied." *Blevins v. City of Tuskegee, Ala.*, 3:09-CV-137-WKW, 2010 WL 2541147, at *5 (M.D. Ala. June 18, 2010). The assigned duties illustrate that the position involved discretionary authority. [Doc. 104-4, Ex. A-1 job description]. The job duties entail several discretionary functions that involve decisions on how to implement policies and programs at the DA's Office. [*Id.*].

As to the last factor, it must be determined whether Younge's position— Director

of Policy and Programs and Deputy Chief of Staff— involved formulating policy for the DA's Office. The job duties of the position include writing criminal justice and crime prevention policies; developing and implementing new initiatives and programs; and ensuring the operational effectiveness of the DA's Office in policy implementation and development. [*Id.*]. In other words, the position includes a wide range of policymaking powers. In *Blevins*, the plaintiff's job description used the same language about developing policies found in Younge's job description. [*Id.*]. The *Blevins* court found the evidence to be sufficient to find the plaintiff fell under the policymaking exception.

All three factors support the policymaker exception for Younge's position. Based on the undisputed material facts, the policymaker exception applies, and the Title VII claims should be dismissed.

### 3. **42 U.S.C. § 2000e(k) – The Pregnancy Discrimination Act**

The Pregnancy Discrimination Act ("PDA") amended Title VII to provide that discrimination based on sex includes discrimination for "pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). The analysis for a pregnancy discrimination claim is the same type of analysis used in other Title VII sex discrimination suits. *Slater v. Energy Serv. Grp. Intern, Inc.*, 441 Fed.Appx. 637, 640 (11th Cir. 2011). "In evaluating disparate treatment claims supported by circumstantial evidence, [the Eleventh Circuit] use the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*." *Id.* "Under the *McDonnell Douglas* framework, the plaintiff has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally." *Id.*

Where, as here, there is no direct evidence that Defendant intended to discriminate based on pregnancy, Younge must present circumstantial evidence from which an inference of intentional discrimination can be drawn. *Spivey v. Beverly Enters.*, 196 F.3d 1309, 1312 (11th Cir. 1999). [6]

To set forth a prima facie case, a plaintiff must establish: (1) she is a member of a protected group; (2) she was qualified for the position; (3) she suffered an adverse effect on her employment; and (4) she suffered from a differential application of work or disciplinary rules. *Id.*

There is no evidence that Younge suffered from a differential application of work or disciplinary rules. Younge was treated like any other employee would have been who had this many co-worker complaints and behavioral issues in less than two months on the job. [Doc. 104-4, Ex. A Howard Decl. ¶¶ 10-11].

Once a prima facie case has been made, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason" for the decision to terminate. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The employer's burden is one of production, not proof. *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981).

Several employees who had worked at the Office for years, some for decades, made complaints about Younge in May and June 2019. [Stmt. of Facts 22-33]. These

---

[6] There are two types of discrimination recognized under Title VII, disparate impact and disparate treatment. *Spivey at 1312*. There is no allegation of disparate impact in this case, so it appears that Plaintiff is travelling under a theory of disparate treatment. Proof of discriminatory intent is necessary for a plaintiff to succeed on a claim of disparate treatment. *Id.*

employees brought their complaints to Chief of Staff Nelson, and those complaints were then passed to Howard. [*Id.* 25, 34].

Lydia Toomer-Popoola, the Director of the Community Court, and the DA's Office lead investigator, Cynthia Nwokocha, who had worked at the DA's Officer for over 23 years, both complained about disturbing, unprofessional incidents concerning Younge's treatment of staff, donors that were lost, and community leaders left feeling "uncomfortable and embarrassed" by Younge's behavior. [*Id.* 26-31].

Toomer complained about staff meetings where Younge yelled and berated Howard in front of the staff. Toomer described the incident as, "appalling," and Nwokocha stated that she "ha[d] never in [her] 23 years at the District Attorney's Office witnessed an employee be so disrespectful to… Paul Howard." [*Id.* 28]. After hearing about the incidents, Howard met with Younge and told her that he could not recall somebody this high in the chain of command being involved in this kind of incident. [*Id.* 30].

Toomer also told Nelson that she witnessed Younge speaking to employees and "making derogatory and demeaning comments about Howard." [*Id.* 31].

Nelson testified to other complaints that she received, including an incident where Plaintiff raised her voice and was rude to a receptionist. [*Id.* 32]. Nelson also recalled a complaint from an attorney who had "a caustic encounter" with Plaintiff on an elevator. [*Id.*].

Howard made the decision to terminate Younge after witnessing an incident in late June 2019. Howard described the incident as the final straw that convinced him that Younge was not a fit for the job. [*Id.* 33]. An attorney on Howard's major crimes

unit who was about to start an important trial, came to Howard's office to discuss the case. The attorney, Lauren Trevis, was stopped by Younge and, in response to Trevis' request to see Howard, was told "in a very loud and rude voice, 'that ain't happening.'" [*Id.*]. Younge was unaware that Howard witnessed the encounter.

Throughout June 2019, Howard was told about each of these complaints. Howard had discussions about Younge's performance and behavior issues. Howard determined that Younge was not a fit for the job and should be terminated. [*Id.* 34-36]. These discussions, including the decision to terminate, occurred in late June. [*Id.*].

Younge was terminated in a July 15 meeting. During the meeting, Howard provided Plaintiff with several reasons for her termination. [*Id.* 38] [7]. Howard told Plaintiff that he was concerned about the number of complaints that her co-workers had made in less than two months. [*Id.* 24, 38]. Howard had employees that had worked for several decades and not had this many complaints made against them, not to mention in less than two months. [*Id.*; Ex. A Howard Decl. ¶¶ 10-11.; Doc. 104-6, Ex. C at 5:30]. Thus, the DA's Office has consistently articulated the legitimate, non-discriminatory reasons for Plaintiff's termination.

In response to the employer's production of a legitimate business reason for the termination, Younge must show that the employer's stated reason for the termination is a pretext. *McDonnell Douglas* at 805. In other words, Younge must show that the "presumptively valid reasons for the termination were in fact a cover-up for a discriminatory decision." *Id.* The ultimate burden of proof remains with the Plaintiff.

---

[7] The audio recording was manually filed with the Court on a USB thumb drive.

*Burdine*, 450 U.S. at 253.

As for pretext, Younge's allegations appear to be based on the proximity between notifying her supervisor of the pregnancy and her termination. But "when an employer contemplates an adverse employment action before an employee engages in a protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." *Slater v. Energy Serv. Grp. Intern, Inc.*, 441 Fed.Appx 637, 642 (11th Cir. 2011).

Lynne Nelson and Howard's testimony show that Younge's termination had been decided upon before the pregnancy notice. Howard testified that the incident involving Lauren Trevis was the final straw and that witnessing that event— along with the employee complaints, the behavior in staff meetings, the derogatory statements to staff members, and the performance issues— convinced him that Younge's continued employment was untenable. [Doc. 104-4, Ex. A Howard Decl. ¶ 12]. Based on this evidence, the temporal proximity does not support causation.

Younge has also suggested that she intends to claim that she handed the pregnancy letter to DA Howard and that he yelled, "is this a threat?" Younge, however, in the July 15th termination meeting, admits this is false. [Stmt. of Facts 39].

Plaintiff cannot show that her termination was pretextual. There is no evidence, that purports to show that the reasons given for Plaintiff's termination were a cover-up for a discriminatory decision. Plaintiff's claim under the PDA should be dismissed.

### 4. **42 U.S.C. § 2000e *et* seq - Title VII Retaliation**

Plaintiff's claim for retaliation fails for two reasons: first, Plaintiff did not undertake a protected activity that the DA's Office could have retaliated against until

after she was terminated; and second, Howard had no knowledge that Plaintiff had engaged in a protected activity until after she was terminated. These facts preclude a retaliation claim under Title VII.

To successfully allege a prima facie retaliation claim under Title VII, a plaintiff must show that: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally connected to the protected expression. *Weeks v. Harden Mfg., Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002). Plaintiff cannot satisfy the third factor.

"A causal connection exists where the plaintiff can show that the decision-maker was aware of the protected conduct and that the protected activity and adverse actions were not wholly unrelated." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000).

Plaintiff met with DA Howard on July 15, 2019, and Howard explained why she was being terminated, [Stmt. of Facts 38], reasons that are discussed in the brief's last section. Howard then gave Plaintiff the option of submitting a resignation letter. On the recording, Plaintiff states on several occasions that she would draft a resignation letter. [*Id*. 40]. In fact, Plaintiff intimates in the recording that she planned to resign anyway, "because of things that were not in the interest of herself and her intelligence level." [*Id*.].

This termination meeting occurred on July 15th and when Plaintiff left the meeting, she testified that she knew she had been terminated. She was directed to turn in her badge and access card immediately. [*Id*. 41]. Plaintiff testified that after the termination meeting, she went to her office and emailed those she was working

with to let them know she was "no longer going to be [with the DA's Office]." [*Id.* 42]. Plaintiff also called her husband "just to let him know…I'm out of a job." [*Id.*].

Plaintiff understood the meeting was an unambiguous termination in which she was allowed to resign rather than have a termination on her record. At the time of the termination meeting, Plaintiff had not filed a charge of discrimination with the EEOC or engaged in any protected activity. [*Id.* 43]. Plaintiff did not file a complaint until after the termination meeting. [*Id.*]. Since Plaintiff had not taken any protected action when she was terminated, there is no causal connection, and the retaliation claim fails.

Further, there is no evidence that Howard was notified about Younge's complaint until after Younge's termination. [*Id.* 44]. This precludes retaliation.

In short, the retaliation claim fails since there is no causal connection between a protected activity and an adverse employment action. Thus, this claim should also be dismissed.[8]

### 5. Plaintiff failed to obtain the required right-to-sue notice from the Attorney General

Both the statute itself, 42 U.S.C. § 2000e-5(f)(1) (2012), and the regulations promulgated by the EEOC, 29 C.F.R. § 1601.28(d), require a litigant making a claim against a state agency, such as a DA's Office, to request a right-to-sue letter from the Attorney General prior to filing suit. In *Solomon v. Hardison*, the Eleventh Circuit held that the statutory requirement is not a mere nullity. 746 F.2d 699, 701-02 (11th Cir. 1985). Under the statute, the United States Attorney General must issue a right-

---

[8] Even if Plaintiff were able to make a prima facie case of retaliation, the claim would still fail under the *McDonnell Douglas* framework. See, prior section.

to-sue letter to a person seeking to file a Title VII lawsuit against a public agency or, at the very least, some attempt must be made to comply with the statute. *Id.* at 701. In the case at bar, Plaintiff has made no effort to comply. Where a defendant in a Title VII case asserts that the plaintiff has not satisfied all conditions precedent to filing suit, "the plaintiff bears the burden of proving that the conditions precedent have been satisfied." *Thompkins v. U.S. Xpress Inc.*, 2014 WL 11460488, at *8 (N.D. Ga. Nov. 26, 2014).

The limited exception known as equitable modification is not applicable herein. For example, in *Hui Li v. Univ. of Fla. Bd. Of Trustee*, the plaintiff's suit was allowed to continue when she produced her right-to-sue letter from the Attorney General issued two days after the issue was raised. 2015 WL 1781578, at *7 (N.D. Fla. Apr. 20, 2015). In *Townsend v. State of Okla. ex rel. Okla. Military Dept.*, the court permitted equitable modification where the plaintiff had tried unsuccessfully to obtain a right-to- sue letter from the Attorney General early in the case. 760 F.Supp. 884, 887 (W.D. Okla. 1991).

But where the summary judgment is staged is reached and the plaintiff has failed to even attempt to comply with the plain language of the statute, as here, such failure is fatal. In *Morimoto v. Univ. of North Texas System*, the court stated:

> In the present case, Plaintiff makes no argument that he ever sought a right-to-sue letter [from the Attorney General]. He only argues that it would be inequitable, at this stage, to force him to request such a letter. The law of this Circuit, however, supports dismissal under circumstances such as these. Had Plaintiff made an effort to obtain a right-to-sue letter and been denied, the Court might find waiver to be appropriate. However, in this instance, Plaintiff argues that he did not seek the letter under the belief that such would be futile. Not only has Plaintiff failed to fully exhaust his administrative remedies, but

he has failed to even attempt to do so.

2006 WL 722126, at *2 (E.D. Texas Mar. 21, 2006). This case is on all fours with Morimoto. First, in Defendant's Initial Disclosures, in section 3 Defendant averred that Plaintiff must prove whether she has "secured a proper right to sue notice under 42 U.S.C. § 2000e-5(f)(1)." In Section 4, Defendant cited the statute, U.S.C. § 2000e-5(f)(1), and the regulation, 29 C.F.R. § 1601.28, as being applicable to this action. [Doc. 104-8, Def. Am. Initial Discl. at 2].

Second and most importantly, this is not the first case that the undersigned has had with the attorney listed as lead counsel for the Plaintiff, and where, as here, there was a failure to obtain a proper notice of right-to-sue after specifically being told it was required. See, *Langston v. Lookout Mtn. Comm. Serv.*, 2017 U.S. Dist. LEXIS 222170, at *23 (N.D. Ga. Nov. 13, 2017) *aff'd on appeal*, 775 Fed.Appx. 991 (11th Cir. 2019). The *Langston* court granted summary judgment for, among other reasons, plaintiff's failure to comply with the statute's notice requirements. The same is true here and, once again, the claims should be dismissed.

## CONCLUSION

For the reasons above, Plaintiff's claims under Title VII should be dismissed with prejudice.

This 13th day of May 2022.

HENEFELD & GREEN, P.C.

/s/ Noah Green
Noah Green
Georgia Bar No. 468138
*Attorney for Defendant*

## CERTIFICATE OF COMPLIANCE

Under Local Rule 7.1(D), I certify that the foregoing has been prepared in compliance with Local Rule 5.1(B) in 13-point Century Schoolbook typeface.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

DR. JASMINE YOUNGE,                    §
                                       §
    *Plaintiff,*                      §        CIVIL ACTION NO.
                                       §        1:20-cv-00684-WMR-CMS
v.                                     §
                                       §
FULTON JUDICIAL CIRCUIT                §
DISTRICT ATTORNEY'S                    §
OFFICE,                                §
GEORGIA,                               §
                                       §
    *Defendants.*                     §

## CERTIFICATE OF SERVICE

This is to certify that I have this day served counsel for the opposing parties with

a copy of **DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR**

**SUMMARY JUDGMENT**, by filing same with the Clerk of Court using the CM/ECF

system which will send notification of such filing to all counsel of record.

This 13th day of May 2022.

                            HENEFELD & GREEN, P.C.

                            /s/ Noah Green
                            Noah Green
                            Georgia Bar No. 468138
                            *Attorney for Defendant*

3017 Bolling Way NE, Suite 129
Atlanta, Georgia 30305
(404) 841-1275
ngreen@henefeldgreen.com