IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| DR. JASMINE YOUNGE, <br><br> Plaintiff, <br><br> v. <br><br> FULTON JUDICIAL CIRCUIT DISTRICT ATTORNEY'S OFFICE, GEORGIA <br><br> Defendant. | Civil Action No. <br><br> 1:20-cv-00684-WMR-CMS <br><br> JURY TRIAL DEMANDED |

**DECLARATION OF DR. JASMINE YOUNGE
PURSUANT TO 28 U.S.C. § 1746**

1.

My name is Dr. Jasmine Younge. I am competent to give testimony, am over the age of 18, and do not suffer from any mental or physical condition that would prevent me from accurately remembering and testifying to the events that I am testifying to in this Declaration. I understand that this Declaration is under penalty of perjury and the statements in this Declaration are true and correct based on my own personal knowledge.

2.

I am offering this declaration to provide further information and clarify things that Defendant may not have asked me about in my deposition.

3.

I worked as the Director of Policy and Programs and Deputy Chief of Staff – a position ranked directly under Chief of Staff Lynne Nelson ("Nelson") – for the Fulton County District Attorney's Office (the "DA's Office") beginning on or about May 1, 2019. (May 1 was my official start date, but District Attorney Paul Howard asked me to come to the office intermittently starting in April to observe the cases, the meetings, and the overall operations of the DA's Office.)

4.

The DA's Office was lead at that time by District Attorney Paul Howard ("Howard").

5.

When I applied to the DA's Office, I had significant experience in operations, consulting, organizational development, and people management. At the time, I also had almost ten years of teaching experience at the time as well as an MBA and PhD.

6.

When I worked at the DA's Office, nearly all of the programs I worked on had been created by my predecessor. I only helped create or modify one or two programs. For all the other programs, my job was to run them efficiently and effectively. I don't believe I wrote any policies during my time working at the DA's Office.

7.

I never had any conflicts, altercations, or heated disputes with anyone in the DA's Office.

8.

I never abruptly left a meeting with Paul Howard, Craig Ferguson, and Bryan Black. I may have quietly left a meeting to use the restroom because I was having nausea due to my pregnancy. But, as I recall, I returned to the meeting when I was done.

9.

I never berated Lydia Toomer in any meeting and specifically not in a meeting with clergy.

10.

I never told Howard in a meeting with Hawks player Kevin Willis that the presentation Howard was passing out was wrong.

11.

In a meeting with Fulton County officials, Howard asked me about a presentation. When I was asked about the presentation, I informed him that I had produced a similar document. Howard responded that my document was not accurate. We proceeded to go through the entire presentation. I informed Howard at the end of the presentation that it was the same as what I had prepared. He apologized and told me that he did not realize the presentations were the same.

12.

I never spoke badly about Howard to other employees, though others spoke badly about him to me.

13.

In mid-June, I never said to an investigator "Do you know who I am?" while putting him down. There was an instance when two investigators were told by Howard to drive a group of people to Ebenezer Baptist Church, including me. The investigator then left us and had lunch over at a bar. When I called to ask where they were, the investigator said they were on the way. They told me that they were

at a restaurant, and I said, "Are you guys in a restaurant? Are you kidding?" I then reported the incident to Howard. I was never confronted by Howard about this incident.

14.

One day, I called an administrative assistant "Kim" instead of "Kimberly" by mistake during a friendly interaction. Kimberly snapped at me and yelled at me. I calmly told Kimberly that she needed to calm down. Kimberly then went to Paul Howard and told him that I disrespected her.

15.

One time, an attorney blocked me from getting off the elevator with her cart. I said, "Excuse me," and the attorney said, "Excuse you!" I responded by saying, "Oh wow, this is interesting."

16.

I never got angry in a meeting with Howard and the Atlanta Public Schools Superintendent for being asked to switch seats. This never happened.

17.

Our staff meetings always included Paul Howard. I never got upset in them if my suggestions were not accepted or embraced.

18.

I never said, "That ain't happening" when Lauren Trevis tried to see Paul Howard. One day, Trevis came to Howard's office and demanded to get on his calendar. Trevis was rude and showed me no respect. I was there and said that he was really booked for the day, that it was jam packed, and that tomorrow morning would work. I did not know what she was coming for, and Trevis did not tell me. If Trevis had told me that Paul Howard instructed her to be placed on his calendar for that day, I would have asked the front desk if there was anything that could be bumped. His usual assistant, Aisha Johnson, was not there that day and the person filling in did not have full access to change his schedule around. I did not disrespect Trevis.

19.

Whenever I met with dignitaries or members of the public, Paul Howard was always present for the meeting. He never passed up a chance to be in the spotlight.

20.

On July 1, 2019, I personally handed Howard a typed letter notifying him that I was pregnant and that my pregnancy was considered high risk.

21.

Howard read the letter while I was standing there and got extremely upset and agitated. He raised his voice and yelled at me asking, "What is this? Is this a threat?"

22.

After I left Howard's office, another employee – Iyana Young ("Iyana") was called to his office. Later on, HR Director Tisa Grimes ("Grimes") told me that Iyana came to her and said that Howard <u>told</u> her that my letter was a threat. (At least, that's what I remember Grimes telling me – that Howard <u>told</u> Iyana that the letter was a threat, whereas he only <u>asked</u> me if it was a threat.)

23.

For the next two weeks, Howard ignored me, reassigned my work duties to others, excluded me from meetings, and would not allow me to speak in meetings that I did attend.

24.

Before I told Howard about my pregnancy, I regularly participated in meetings for each of the programs I was responsible for. After I told him about my pregnancy, Howard excluded me from many meetings about these same programs.

25.

Before I told Howard about my pregnancy, I was never told that there were any issues with my performance or work product at the DA's Office.

26.

Before I told Howard about my pregnancy, I only ever received praise for my work.

27.

At no time during my employment with the DA's Office did anybody tell me that I was in any way rude, disrespectful, or unprofessional.

28.

After my pregnancy disclosure, Howard gave a number of my work duties to Chris Hopper (who is white) and told me that I should be ashamed that my work had to be given to a white man.

29.

I previously testified that it was odd that Howard replaced me with Hopper in meetings with dignitaries. This is because Hopper was in charge of communications and had nothing to with operations. Hopper's job was to create narratives for the media.

30.

I testified in my deposition that I worked "all day every day" with Howard, or something to that effect. This was obviously hyperbole. I was trying to explain that Howard and I worked closely together, and he demanded constant availability around the clock. We did work closely together – until I notified him of my pregnancy. After that, he avoided me, excluded me from meetings, and frequently refused to meet with me.

31.

Before I told Howard about my pregnancy, I had open door access to him. I could go into his office and talk to him about something whenever his door was open, without an appointment. But that ended after I notified him of my pregnancy. The first time I tried to pop into his office after that, he told me "I'm not talking right now" and told me to leave. After that, I never again had the same easy access to him or the same close day-to-day working relationship. I couldn't just pop into his office and talk to him about something.

32.

I did not handle any sensitive, confidential, or case related materials for Howard.

33.

I worked on the budget with Nelson. Nelson and I had many meetings on the budget. I submitted my work to her. She would direct me to obtain certain information from others and input it into the budget.

34.

During the July 15 meeting with Howard and Nelson in which Howard demanded that I submit my resignation, I brought up his statement that my letter about my pregnancy was a "threat." (I was thinking about his statement to Iyana Young that my letter was, in fact, a threat – not his question to me when he merely <u>asked</u> "is this a threat?").

35.

To me, there is a big difference between <u>asking</u> whether my letter was a threat and affirmatively <u>stating</u> the letter was a threat. My letter was <u>not</u> a threat, and Howard's claim to Iyana Young that it <u>was</u> a threat was foremost on my mind during the July 15 meeting.

36.

During that meeting, I repeated several times "those were your words" when talking about his "threat" statement to Iyana Young. Then Howard asked whether "those [the 'threat' statement] were my words <u>to you</u>?" I answer, "nope no"

because he did not affirmatively tell <u>me</u> that my letter was a threat. Those were his words to <u>Iyana Young</u>.

37.

Howard then changed the subject and the meeting continued.

38.

Howard did not respect chain of command. He would allow individuals with supervisors to come to him directly or he would go over supervisors' head to their subordinates. I often raised this to him as an issue.

I have read this Declaration and affirm under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have personal knowledge of the statements I have made above and that these statements are true and correct.

So sworn this day, June 10, 2022,

Dr. Jasmine Younge