IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DR. JASMINE YOUNGE,
    Plaintiff,

v.

FULTON JUDICIAL CIRCUIT
DISTRICT ATTORNEY'S OFFICE,
    Defendant.

CIVIL ACTION NO.
1:20-cv-684-WMR-CMS

## **FINAL REPORT AND RECOMMENDATION**

Plaintiff Jasmine Younge brings claims in this case under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), for gender discrimination (Count One) and retaliation (Count Two) against her former employer, Defendant Fulton Judicial Circuit District Attorney's Office ("Defendant").[1] [Doc. 31, Am. Compl.]. Younge alleges she was treated differently and ultimately terminated after she informed Paul Howard, who was serving as district attorney at the time, that she was pregnant. [*Id.* ¶¶ 14–22, 29–31, 35–38].

---

[1] Younge's claims for race discrimination (Counts Three and Four) and gender-based discrimination in violation of Equal Protection Rights Under the Fourteenth Amendment Pursuant to 42 U.S.C. § 1983 (Count Five) were dismissed from the case on March 10, 2021. [Doc. 52, Order]. In addition, to the extent Count One of the amended complaint purported to allege a non-pregnancy related sex discrimination claim, that portion of Count One was dismissed. [*Id.*].

Thus, Younge's gender discrimination claim specifically alleges that she was discriminated against on the basis of her pregnancy in violation of Title VII, as amended by the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k). [Am. Compl. ¶ 45].

Defendant presently moves for summary judgment on several grounds. [Doc. 104]. First, Defendant argues that Younge is barred from seeking relief under Title VII because she was not an "employee" but was someone chosen by an elected official, then District Attorney Paul Howard, to be on his personal staff and was an appointee on the policymaking level. [Doc. 104-1 at 4–17]. [2] Defendant next argues that even if Younge meets the definition of "employee" under Title VII, the undisputed facts establish that Defendant did not discriminate against Younge on the basis of her pregnancy and that Howard, having no knowledge of any protected conduct by Younge at the time he made the termination decision,[3] did not retaliate

---

[2] For purposes of this Report and Recommendation, unless otherwise indicated, citations to the record are made to the CM/ECF heading at the top of the page cited; citations to deposition pages are to the actual page number of the hardcopy deposition transcript.

[3] Defendant specifically argues that Younge did not engage in protected activity until after she was terminated and that Howard, the decisionmaker, had no knowledge that Plaintiff engaged in protected activity until after she was terminated. [Doc. 104 at 21–22].

against Younge.  [*Id.* at 17–23].  Defendant finally argues that the case should be dismissed because Younge did not obtain the requisite right-to-sue notice from the Attorney General prior to commencing this lawsuit.  [*Id.* at 23–25].

Younge has filed a response to the summary judgment motion, asserting multiple arguments as well.  [Doc. 109].  Younge maintains that Defendant failed to plead the employee exemptions as affirmative defenses and that Defendant therefore has waived them.  [*Id.* at 4–7].  Younge argues that she has been prejudiced in her ability to gather evidence pertaining to the "personal staff" exemption but maintains that the limited evidence available indicates that there are genuine disputes of material fact that preclude Defendant from establishing on summary judgment that she was a member of Howard's "personal staff."  [*Id.* at 7–12].  Younge argues that she had no ability to explore the policymaking appointee defense.  [*Id.* at 12]. Younge next asserts that Defendant failed to plead with particularity her alleged failure to obtain a right-to-sue notice from the Attorney General, [*id.* at 12–17], and she objects to Defendant's argument on this matter being considered by the Court at all because Defendant only raised the argument after the Court ordered Defendant to refile its summary judgment motion in a manner that complied with the Court's Scheduling Order and Case Management Instructions, [*id.* at 15–16; doc. 110].

3

Finally, Younge argues that she has presented a convincing mosaic of circumstantial evidence of pregnancy discrimination.  [Doc. 109 at 17–26].

On December 9, 2022, I held a hearing on Defendant's motion for summary judgment.  One of the issues that I raised, among many, was Younge's failure to make any arguments in her response brief pertaining to her retaliation claim.  I advised that I would be recommending that the retaliation claim be deemed abandoned, and Plaintiff's counsel confirmed that Younge did not intend to pursue the retaliation claim.  *See Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("[F]ailure to brief and argue [an] issue . . . before the district court is grounds for finding that the issue has been abandoned.").  During the hearing, Plaintiff's counsel and defense counsel also provided information and additional argument pertaining to the remaining pregnancy discrimination claim, including potential affirmative defenses to that claim, and my analysis of the pregnancy discrimination claim will take much of that information and argument into account.

Defendant's motion for summary judgment having been fully briefed and the Court having had the benefit of oral argument, Defendant's motion for summary judgment is now ripe for resolution.  For the reasons stated below, I will recommend that the motion for summary judgment be **GRANTED**.

# I.   PRELIMINARY MATTERS

## A. Defendant's Failure to Plead "Employee" Exemptions in Answer

As mentioned above, Defendant argues on summary judgment that Younge does not meet the definition of an "employee" under Title VII because of the "personal staff" and "policymaking appointee" exemptions, which are set forth in 42 U.S.C. § 2000e(f).  Younge asserts that these exemptions are affirmative defenses that Defendant has waived by failing to plead them in its responsive pleading.

### 1. Employee Exemptions are Affirmative Defenses

The Eleventh Circuit has not addressed whether the exemptions to employee status under Title VII are affirmative defenses.  Circuit courts that have considered the issue have reached contradictory conclusions.  The Fourth Circuit has held that "employee status is an element of a substantive Title VII claim," which can be raised in a motion at any time up to and including during a trial on the merits.  *Curl v. Reavis*, 740 F.2d 1323, 1327 n.2 (4th Cir. 1984) (holding that the issue of employee status was not untimely raised where defendants first presented the issue in a motion to dismiss on the second day of trial).  In contrast, the Fifth Circuit has held that the "personal staff" exemption is an affirmative defense that must be pled, reasoning that the defense "allows the defendant to avoid liability even if the plaintiff meets his burden of proof under Title VII."  *Oden v. Oktibbeha Cnty., Miss.*, 246 F.3d 458,

467 (5th Cir. 2001) (affirming district court's denial of motion for judgment as a matter of law, which was filed after jury returned verdict and the district court entered its judgment, because the personal staff exemption raised in the motion for the first time had not been raised in the defendants' responsive pleading); *cf. Nichols v. Hurley*, 921 F.2d 1101, 1111 (10th Cir. 1990) (analyzing the merits of the "personal staff" exemption using a burden-shifting framework that suggested the court considered the exemption an affirmative defense).  I find the reasoning of the Fifth Circuit persuasive, as have most district courts that have considered this issue, including at least one district court within the Eleventh Circuit.  *See Douglas v. Bd. of Trustees of Cloud Cnty. College*, No. 21-2400-KHV, 2022 WL 1538678, at *8 (D. Kan. May 16, 2022) ("The personal staff exemption is an affirmative defense that defendants must plead under Rule 8(c)."); *Crenshaw v. City of Wetumpka, Ala.*, No. 2:15-cv-413-WKW, No. 2:15-cv-696-WKW, 2017 WL 4330776, at *4 (M.D. Ala. Sept. 29, 2017) (finding *Oden* persuasive and concluding that the "personal staff" and "policy-making-appointee" exemptions are affirmative defenses); *Donatello v. Cnty. of Niagara*, No. 15-cv-39V, 2016 WL 3090552, at *9 (W.D.N.Y. June 2, 2016) ("The Court will treat the [Title VII "employee"] exemptions as affirmative defenses." (citing *Oden*, 246 F.3d at 467)); *Hindman v. Thompson*, 557

F. Supp. 2d 1293, 1301 (N.D. Okla. 2008) (agreeing with *Oden* that the personal staff exemption is an affirmative defense that must be pleaded).

2. <u>Notice of Defendant's Intent to Rely on Employee Exemptions</u>

Here, Defendant makes no argument that it pled the exemptions as affirmative defenses. *See generally* [Doc. 122 at 2–15]. Moreover, the Court's own review of Defendant's Answer to Plaintiff's First Amended Complaint for Damages [Doc. 53] indicates that Defendant did not plead the exemptions as affirmative defenses. During oral argument, I inquired about Defendant's failure to raise the employee exemptions earlier in the litigation, and defense counsel explained that the employee exemptions came to his attention when he began drafting the summary judgment motion in February or March. Defense counsel stated, and Plaintiff's counsel agreed, that Defendant did not put Plaintiff on notice of its intent to rely on the "personal staff" exemption until a hearing that the district judge held on an unrelated issue on March 14, 2022.[4] *See* [Doc. 91].

Younge acknowledges that courts have allowed defendants to avoid waiver of unpled defenses where the plaintiff has notice that the issue is being litigated, such

_____

[4] Younge acknowledges that Defendant made five references in its discovery responses to Younge being a member of Howard's "personal staff." [Doc. 109 at 7]. In addition to these references, during the deposition of Howard's chief of staff, Lynne Nelson, Younge's own attorney asked Nelson whether Younge was a member

as when the issue is the subject matter of discovery. *Edwards v. Fulton Cnty.*, 509

F. App'x 882, 887 (11th Cir. 2013) ("We have . . . concluded that an omission of an

affirmative defense in responsive pleadings does not prejudice a plaintiff when the

defendant first raises the defense in a pretrial motion or discussion and the subject

matter of discovery suggests that the defendant will rely on the defense."); *Hassan*

*v. U.S. Postal Serv.*, 842 F.2d 260, 263 (11th Cir. 1988) ("When a plaintiff has notice

that an affirmative defense will be raised at trial, the defendant's failure to comply

with Rule 8(c) does not cause the plaintiff any prejudice."); *Jones v. Miles*, 656 F.2d

---

of Howard's "personal staff." [Doc. 94, Deposition of Lynne Nelson "Nelson Dep." at 30]. Plaintiff's counsel also asked Nelson about the supervisory oversight for Younge's position, with Nelson testifying that Younge was not her immediate subordinate and that only Howard was Younge's supervisor. [Id. at 39]. Howard also testified during his deposition about Younge being a "key member of [his] personal staff" and how he interacted with Younge, as her immediate supervisor, and others who reported directly to him as part of his "personal staff." [Doc. 95, Deposition of Paul Howard "Howard Dep." at 15, 24, 28, 110, 116]. In her own deposition, Younge did not use the terminology "personal staff," but she made several references to being a part of Howard's "executive staff" and testified about what that entailed. [Doc. 93, Deposition of Jasmine Younge "Younge Dep." at 46, 47, 72, 121, 131]. Indeed, one of the facts that Younge alleged in her amended complaint and about which she testified during her deposition was that she was told by Human Resources that she could not file a complaint or grievance with Human Resources because she was part of Howard's executive staff. [Doc. 31, Am. Compl. ¶ 33; Younge Dep. at 131]. Notwithstanding these various references to "personal staff" and "executive staff" earlier during the litigation, it is now clear to the Court that Defendant was not even thinking about the employee exemptions at the time these references were made. Thus, Defendant did not purposefully put Plaintiff on notice of its intent to rely on the employee exemptions until March 14, 2022.

103, 107 n.7 (5th Cir. Unit B Aug.1981) ("Neglect to affirmatively plead [an affirmative defense] is simply noncompliance with a technicality and does not constitute a waiver where there is no claim of surprise.").

In this case, discovery did not put Younge on notice that Defendant would raise the employee exemptions as affirmative defenses.  Furthermore, by the time Defendant explicitly mentioned its intent to rely on the "personal staff" exemption, discovery had closed approximately two months prior, except for ongoing litigation regarding a second deposition that was to be taken of Howard.  Still, while the discovery period had technically closed, summary judgment motions had not yet been filed, given the outstanding second deposition of Howard.  Thus, there was an opportunity for Younge to seek leave to take additional discovery on the "personal staff" exemption before Defendant filed a dispositive motion.  Younge did not do so, and Plaintiff's counsel argued during the hearing that Defendant should have had the burden of seeking leave to amend its answer to assert the affirmative defenses.

### 3.  Prejudice to Plaintiff

Regardless of what could or should have happened from a procedural perspective to address the belated injection of the employee exemptions into the case, the key question that I must address in deciding whether the proposed affirmative defenses should be determined to be waived is whether Plaintiff has

suffered any prejudice.  "[W]hen the failure to raise an affirmative defense does not prejudice the plaintiff, it is not error for the trial court to hear evidence on the issue." *Hassan*, 842 F.2d at 263.  In the instant case, I find that Defendant's failure to raise the "personal staff" exemption earlier has not prejudiced Younge but that Defendant's failure to raise the "policymaking appointee" exemption earlier has been prejudicial.

### a.  "Personal Staff" Exemption

Even though the parties were not focused on the "personal staff" exemption during discovery, the discovery they took is highly relevant to the "personal staff" exemption and the factors that courts consider in determining whether the exemption applies.  Specifically, courts typically consider the following non-exhaustive list of factors:

> (1) Whether the elected official has plenary powers of appointment and removal, (2) whether the person in the position at issue is personally accountable to only that elected official, (3) whether the person in the position at issue represents the elected official in the eyes of the public, (4) whether the elected official exercises a considerable amount of control over the position, (5) the level of the position within the organization's chain of command, and (6) the actual intimacy of the working relationship between the elected official and the person filling the position.

*Laurie v. Ala. Ct. of Crim. App.*, 88 F. Supp. 2d 1334, 1338 (M.D. Ala. 2000), *aff'd*, 256 F.3d 1266 (11th Cir. 2001) (citations omitted).  "[C]ase law indicates that the

sixth factor is the most important factor." *Laurie*, 88 F. Supp. 2d at 1338 (citing cases).

In this case, depositions were taken of Younge, Howard, and Howard's chief of staff, Lynne Nelson.  These deponents were questioned extensively about (1) the circumstances of Younge's hiring and firing, including who made those employment decisions; (2) the reporting structure to which Younge adhered; (3) the work that Younge did for the District Attorney's Office, including out in the community and in meetings with dignitaries, community leaders, and members of the public; (4) the amount and nature of Howard's control over Younge's position and the work she performed; (5) the organizational hierarchy within the District Attorney's Office, including Younge's placement in that hierarchy; and (6) the nature of Howard's working relationship with Younge and other members of his personal or executive staff.  The breadth of relevant discovery concerning the "personal staff" exemption suggests that Younge has not suffered any prejudice. *See Edwards*, 509 F. App'x at 888 ("Because the Defendants first raised the defense in their motion for summary judgment . . . and because discovery largely focused on . . . the subject matter of the defense, we cannot conclude that the district court abused its discretion in denying that the Defendants prejudiced Edwards by raising the defense on summary

judgment and rejecting the argument that the Defendants waived the defense."). I will examine the issue of prejudice more closely below.

During oral argument on Defendant's motion, I heard from the parties regarding any prejudice that Younge has suffered as a consequence of the belated assertion of the "personal staff" exemption affirmative defense, and I specifically asked Plaintiff's counsel to inform me of discovery he would have taken if the "personal staff" exemption had been raised earlier. Plaintiff's counsel mentioned three topics about which he would have taken discovery: (1) whether Younge was subject to the sole supervision of Howard; (2) whether Howard had plenary authority to appoint and remove Younge; and (3) whether Younge represented Howard in the eyes of the public.

Younge and Howard both have testified regarding the first and third topics, and Plaintiff also has obtained testimony on the first topic from Chief of Staff Nelson and Tisa Grimes, who was the HR Director/Office Manager for Fulton County District Attorney's Office when Younge applied and was hired. Regarding the first topic, each deponent testified that Howard was Younge's supervisor. [Younge Dep. at 62; Howard Dep. at 24; Nelson Dep. at 39]. Howard and Nelson specifically rejected the suggestion by Plaintiff's counsel that Nelson supervised Younge. [Howard Dep. at 24; Nelson Dep. at 39]. Younge has her own declaration testimony

and the declaration testimony of HR Director Grimes indicating that Howard's Chief of Staff sometimes directed Younge to execute tasks and conveyed what Howard wanted done. [Doc. 111-2, Declaration of Dr. Jasmine Younge "Younge Decl." ¶ 33; Doc. 109-3, Declaration of Tisa Grimes "Grimes Decl." ¶ 5]. During oral argument, Plaintiff's counsel could not specify what other discovery he would take on the first topic, but in her brief opposing the summary judgment motion, Younge argued that she would "have delved more deeply into other ways that Younge was held accountable to Nelson or other officials besides Howard." [Doc. 109 at 10]. This is information that should be known to Younge. There is no prejudice resulting from Younge's inability to take additional discovery on this topic.

Regarding whether Younge represented Howard in the eyes of the public, Younge and Howard have been questioned and have provided relevant testimony. Notably, Younge testified that she was "in contact with a lot of persons in the community on behalf of the DA's Office." [Younge Dep. at 39]. She also testified that before she notified Howard of her pregnancy, she was at every meeting Howard had with dignitaries and visitors to the District Attorney's Office. [*Id.* at 34]. Howard testified that he saw Younge as someone who spoke for him. [Howard Dep. at 42]. Howard likewise averred that "[b]ecause of Plaintiff's job duties and her interaction with [his] constituents, such as the public, community leaders, and

13

dignitaries, Plaintiff represented the DA in the community more than any other member of [his] personal staff."  [Doc. 104-4, Declaration of Paul Howard Jr. ("Howard Decl.") ¶ 5].  Plaintiff's counsel suggested that he might have been interested in deposing members of the public, but he did not have any particular persons in mind.  This answer to my question reveals that any additional discovery on this topic would be a mere fishing expedition.

     With respect to the second topic, Plaintiff's counsel asserted that he would have deposed representatives of Fulton County to inquire about the rules that apply to Howard's appointment and removal of staff members and to understand the circumstances of the purported rejection of Howard's initial appointment of Younge. However, the evidence upon which Younge relies to argue that her initial appointment was rejected does not support that characterization of what transpired. Rather, Younge testified that Howard simply had to change her formal title in the Fulton County system from that of Director of Policy and Programs to Deputy Chief of Staff for her to receive her desired salary and the salary that was offered. [Younge Dep. at 27].  While Younge was designated in Fulton County's system as Deputy Chief of Staff, Younge acknowledges that she was hired to work as Director of Policy and Programs and Deputy Chief of Staff.  [*Id.*; Howard Decl., Ex. A-2, Interview Schedule; Ex. A-3, Job Offer; Ex. A-4, Official Oath in Support of Hiring

Personal Staff; Younge Decl. ¶ 3].  Thus, whereas the "personal staff" exemption balancing test is concerned with the appointment and removal powers of the elected official, the issue here was Younge's salary, not her selection to be appointed to Howard's personal staff.  *See Conley v. City of Erie, Pa.*, 521 F. Supp. 2d 448, 453 (W.D. Pa. 2007) (holding that an elected official still had plenary powers of appointment and removal over the plaintiff even though the elected offical did not have the authority to hire as many individuals as he wanted or control the salary decisions for the plaintiff's position).  I do believe that it may have been worthwhile for Younge to take discovery pertaining to the application of the rules that apply to Howard's appointment and removal of staff members under O.C.G.A. § 15-18-20(a).  However, as I will explain in detail below, even if Howard did not have plenary powers of *appointment* and removal, the other five factors of the balancing test so overwhelmingly favor finding that Younge was a member of Howard's personal staff that Howard's inability to explore this limited topic in discovery really is insignificant.

Because Plaintiff's counsel has not persuasively argued a basis for finding prejudice as it relates to the belated notice of Defendant's intent to rely on the

"personal staff" exemption, I conclude that the "personal staff" exemption is properly before the Court and should be considered on the merits.

### b. "Policymaking Appointee" Exemption

I find that the "policymaking appointee" exemption is not properly before the Court. Again, Defendant makes no argument that this exemption was pled as an affirmative defense, and Defendant also makes no argument that notice of the litigation of this exemption was provided through discovery or otherwise. In contrast to the "personal staff" exemption, there was not extensive discovery on the policymaking aspects of Younge's job functions and there is no indication that Defendant mentioned the "policymaking appointee" exemption during the telephone hearing with the district judge. Defense counsel also conceded during the hearing that Defendant's focus is primarily on the "personal staff" exemption, not the "policymaking appointee" exemption. Therefore, I conclude that Defendant waived its right to assert a defense based on the "policymaking appointee" exemption.

### B. Defendant's Failure to Timely Assert Argument Regarding Right-to-Sue Notice

Defendant argues in its summary judgment motion that Younge failed to obtain the required right-to-sue notice form the Attorney General, as required by 42 U.S.C. § 2000e-5(f)(1) and 29 C.F.R. § 1601-28(d). As mentioned above, Younge

16

objects to this argument as being untimely raised. [Doc. 110]. Defendant has not offered any response to Younge's objection. Having considered Younge's objection and the record of the case, I sustain Younge's objection and will not consider the merits of Defendant's argument concerning the right-to-sue notice because Defendant did not timely assert the argument by the deadline to file summary judgment motions.

The deadline to file dispositive motions in this case was April 8, 2022. [Doc. 88]. Defendant filed a summary judgment motion on April 8, 2022, and then filed an amended summary judgment motion on April 11, 2022.[5] In neither of these filings did Defendant mention any issue with the right-to-sue notice. *See generally* [Docs. 96-1, 97-1]. Due to Defendant's failure to follow the Court's procedural instructions concerning the filing of summary judgment motions, as set forth in the Court's Scheduling Order and Case Management Instructions, the Court struck Defendant's summary judgment filings and ordered Defendant to refile its motion in a manner that complied with those instructions, including the Court's Order Modifying Local Rule 56.1. [Doc. 103]. Defendant did not request, and this Court did not grant, leave for Defendant to amend the substance of its motion for summary

---

[5] The amended motion for summary judgment included two additional exhibits.

judgment. Nevertheless, in the summary judgment motion that Defendant filed on May 16, 2022, Defendant raised the issue concerning the right-to-sue notice. Raising this issue after the dispositive motions deadline and without leave of court was improper. Therefore, the Court sustains Younge's objection and will not consider Defendant's arguments concerning the right-to-sue notice.[6]

## II. __SUMMARY JUDGMENT STANDARD__

Summary judgment is authorized when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). The movant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving

---

[6] I note that the requirement that the right-to-sue notice come from the Attorney General is a non-jurisdictional requirement. *Fouche v. Jekyll Island-State Park Auth.*, 713 F.2d 1518, 1524–26 (11th Cir. 1983) ("[A]ll Title VII procedural requirements to suit are henceforth to be viewed as conditions precedent to suit rather than as jurisdictional requirements."). Therefore, I have no problem finding that Defendant has waived this issue as a basis for seeking summary judgment. *Cf. Solomon v. Hardison*, 746 F.2d 699 (11th Cir. 1985) (holding that the requirement that a plaintiff secure a right-to-sue notice from the Attorney General was a condition precedent that was due to be equitably waived in that case).

party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The court must view the evidence and all factual inferences in the light most favorable to the nonmoving party.  *Adickes*, 398 U.S. at 158–59.

Once the moving party has adequately supported its motion, the nonmoving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The nonmoving party must "go beyond the pleadings" and present competent evidence designating "specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324.  Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed facts.  *See Anderson*, 477 U.S. at 249.  Rather, the court only determines whether there are genuine issues of material fact to be tried.  Applicable substantive law identifies those facts that are material and those that are not.  *Id.* at 248.  Disputed facts that do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment.  *Id.*

19

III.  **FACTS**

Considering the foregoing summary judgment standard, I find the following facts for the purpose of resolving Defendant's pending motion for summary judgment only.

### A. Younge's Employment with the Fulton Judicial Circuit District Attorney's Office

In April 2019, Younge was hired by then District Attorney Paul Howard as Deputy Chief of Staff and Director of Policy and Programs at a salary of $120,282.00, which was one of the top three salaries in the District Attorney's Office. [Doc. 105, Def.'s Stmt. of Mat. Facts ("DSMF"), ¶¶ 1, 2; Doc. 112-2, Pl.'s Resp. to Def.'s Stmt. of Mat. Facts ("RSMF") ¶¶ 1, 2; Howard Decl., Ex. A-2, Interview Schedule; Ex. A-3, Job Offer; Younge Decl. ¶ 3]. Howard initially sought to hire Younge in the Director position at a salary of $125,000.00, but he was unable to hire her in that position with that salary. [Doc. 112-2, Pl.'s Stmt. of Additional Facts ("PSAF") ¶ 6; Younge Dep. at 26–28]. To enable Younge to get the salary she requested and that had been offered in the Job Description,[7] Howard had to make Younge's formal title in the Fulton County system "Deputy Chief of Staff."

---

[7] Younge testified that while she started at a salary lower than $125,000.00, there was going to be a countywide raise occurring within a month after she started that would have increased her salary to $125,000.00. [Younge Dep. at 27–28].

[Younge Dep. at 27; Grimes Decl. ¶ 5; Howard Decl., Ex. A-1, Job Descriptions].
As part of the process of hiring Younge at the initial salary of $120,282.00, Howard
signed an Official Oath in Support of Hiring Personal Staff, swearing that he had
"reviewed the definition of 'personal staff' contained in the Fulton County Personnel
Policies and Procedures" and that he intended to hire Younge as a Deputy Chief of
Staff "to be a member of [his] personal staff."  [Howard Decl., Ex. A-4, Official
Oath in Support of Hiring Personal Staff].

From May 1, 2019, Younge's first day of employment, throughout most of
the time that Younge was employed by Defendant, Younge oversaw the
administrative division of the District Attorney's Office.  [DSMF ¶ 4; RSMF ¶ 4;
Howard Decl., Ex. A-1, Job Descriptions; Younge Decl. ¶ 3].  According to Job
Descriptions for her position, Younge oversaw the "policy implementation and
development, management and oversight of bureaus, strategic communications, and
responsive constituent services." [Howard Decl., Ex. A-1, Job Descriptions].  The
Job Descriptions further provide that she was the principal writer of Criminal Justice
and Crime Prevention policies and programs, and she developed, implemented, and
administered the programs.  [*Id.*].  Younge avers, however, that the vast majority of
programs she worked on, except for one or two, were created by Younge's
predecessor and Younge simply was tasked with running the programs efficiently

and effectively. [Younge Decl. ¶ 6]. Younge also does not recall writing any policies while she worked at the District Attorney's Office. [*Id.*]. Younge did collect criminal justice data at the direction of Howard, and she worked closely with Howard on a daily basis. [DSMF ¶ 8; RSMF ¶ 8].

Younge was third in the chain of command for the entire District Attorney's Office. [DSMF ¶ 3; RSMF ¶ 3]. Younge supervised more than thirty employees in more than seven departments at the District Attorney's Office. [DSMF ¶ 7; RSMF ¶ 7]. Moreover, at any given time up until the time that she notified Howard of her pregnancy, Younge supervised fifteen to twenty different policies and programs implemented by the District Attorney's Office. [DSMF ¶ 11; RSMF ¶ 11; Howard Decl. ¶ 6]. Howard set the agenda for the policies and programs that would be a focus of the District Attorney's Office. [DSMF ¶ 15; RSMF ¶ 15].

Throughout most of the time that Younge was employed by Defendant, Younge met with dignitaries, community leaders, and members of the public who came into the office. [Younge Dep. at 34–35, 39; Howard Decl. ¶ 5]. Howard was always present for these meetings. [Younge Decl. ¶ 19]. Younge represented Howard to the public more than any other member of Howard's personal staff, and Howard was constantly involved with her work because the voters would judge him

based on how well Younge implemented the Office's policies and projects.  [Younge

Dep. at 36–37, 39; Howard Decl. ¶¶ 5, 7].

In her position as Deputy Chief of Staff and Director of Policy and Programs,

Younge was accountable to Howard.   [Younge Dep. at 62; Howard Decl. ¶ 4;

Howard Dep. at 24].   Howard's chief of staff, Nelson, sometimes directed Younge

to execute tasks or conveyed Howard's instructions to Younge, but Nelson was not

Younge's supervisor.  [PSAF ¶ 7; Howard Dep. at 24; Nelson Dep. at 39; Younge

Dep. at 62].  Up until the time that she notified Howard of her pregnancy, Younge

met with Howard every day.   [DSMF ¶ 13; RSMF ¶ 13; Younge Dep. at 38].

Younge's schedule was "pretty much the schedule that DA Paul Howard had," and

Younge was involved in "anything" that had to do with the District Attorney's

Office.  [Younge Dep. at 34–37].  If Howard "needed something done, [Younge]

would handle it."  [*Id.* at 38].  Younge testified that she discussed the progress of

initiatives she was overseeing with Howard "[a]ll day every day."  [*Id.* at 43].

Younge had meetings with Howard "all the time," and she "was in and out of his

office because [the personal staff] were . . . the essential folks [in the Office]."  [*Id.*

at 46–47].  Younge testified that Howard was "very involved [with the policies and

programs she oversaw] . . . He made it a point to be very involved in every single

thing . . . ."  [DSMF ¶ 19; RSMF ¶ 19].  Howard would even send Younge work-

related messages on weekends.  [DSMF ¶ 19; RSMF ¶ 19].  Up until the time that Younge notified Howard of her pregnancy, Younge did not need to make appointments to see Howard because she "was literally his go-to person for almost everything," and she was "one of the few on staff that was just able to walk into his office at any time."  [Younge Dep. at 68].  According to Howard, Younge was "a key member of [his] personal staff" and "a high-ranking part of [his] staff, because that is certainly what [he] considered her [to be]."  [Howard Dep. at 110].  Before Younge's pregnancy announcement, Younge and Howard met frequently, she had "open door" access to his office, and he required Younge to be available around the clock.  [PSAF ¶ 24; Doc. 123, Def.'s Resp. to Pl.'s Stmt. of Add'l Facts "DRPSAF" ¶ 24].

## B. Younge's Pregnancy, Termination, and Replacement

Younge became pregnant during her employment, and her pregnancy was diagnosed as "high risk."  [PSAF ¶ 1; DRPSAF ¶ 1].  On July 1, 2019, Younge provided Howard a letter stating that she was pregnant and that the pregnancy was "high risk."  [DSMF ¶ 37; RSMF ¶ 37].  After Younge notified Howard of her pregnancy, Howard stopped meeting with Younge, excluded her from meetings, dismissed her when she tried to talk to him, and reassigned some of her work duties.

[PSAF ¶¶ 24–26; Younge Decl. ¶¶ 23, 24, 28, 29, 30; Young Dep. at 83–84, 87–88, 98–99, 102].

Howard and his chief of staff, Nelson, both claim that Younge exhibited serious performance deficiencies and unprofessional behavior long before Younge's July 1st pregnancy announcement—as early as May.  [PSAF ¶ 31; DRPSAF ¶ 31; DSMF ¶¶ 23–34].  On July 15, 2019, Howard met with Younge to terminate her, and Howard told Younge the reasons that she was being let go, including the number of complaints made by coworkers in less than two months and behavior issues.  [DSMF ¶ 38; RSMF ¶ 38].  Howard admits that nothing happened between the July 1st pregnancy announcement and the July 15th termination meeting that caused him to believe Younge should be terminated.  [PSAF ¶ 21; DRPSAF ¶ 21].  Howard claims that the incident that was the "final straw," which led to his decision to terminate Younge, occurred near the end of June, when Howard says he observed Younge being rude to an attorney who was trying to meet with Howard.  [PSAF ¶ 38; DRPSAF ¶ 38; Howard Decl. ¶ 12; Howard Dep. at 128–31].  Younge disputes that these complaints and behavior issues actually occurred, and she states that none of these purported issues were brought to her attention before the time that she notified Howard of her pregnancy.  [RSMF ¶¶ 23–34; PSAF ¶¶ 32–33, 39; Younge Decl. ¶¶ 7–18, 25–27].

25

According to HR Director Grimes, if there were problems with Younge's performance or behavior, those problems should have been documented contemporaneously in Younge's personnel file. [PSAF ¶ 34]. There were no disciplinary actions, warnings, reprimands, complaints, or documentations of conflicts in Younge's personnel file—even immediately after her termination. [*Id.* ¶ 35]. The only complaints in existence regarding Younge's behavior or performance during her employment at the District Attorney's Office were reduced to writing in mid-August 2019, weeks after Younge's termination. [*Id.* ¶ 36]. These statements were solicited by Nelson, at Howard's request, after Younge's termination and after Howard said he believed Younge would file a lawsuit and he wanted to "be prepared." [PSAF ¶ 37; Nelson Dep. at 13–16; Grimes Decl. ¶¶ 16–17, 21; Doc. 109-10, Post-Termination Statements].

Younge stated during the termination meeting that she would provide a resignation letter and insinuated that she was going to resign anyway "because of things that were not in the interest of [herself] and [her] intelligence level." [DSMF ¶ 40; RSMF ¶ 40]. Younge was directed to turn in her badge and access card during the July 15th termination meeting. [DSMF ¶ 41; RSMF ¶ 41]. Younge testified that she was terminated after the July 15th meeting; she then sent final emails to tell people "she was no longer [with the District Attorney's Office]," and called her

husband because she was out of a job.  [DSMF ¶ 42; RSMF ¶ 42].  Younge did not file any complaints or charges with the Equal Employment Opportunity Commission "EEOC" until after the July 15th termination meeting, and Howard had no knowledge of complaints until after Younge's termination on July 15th.  [DSMF ¶¶ 43, 44; RSMF ¶¶43, 44].

It is undisputed that the decision to terminate Younge was made solely by Howard.  [DSMF ¶ 35; RSMF ¶ 35].  Because Chief of Staff Nelson was Howard's top advisor on staffing issues, Howard told Nelson about his intent to terminate Younge before he ever carried it out.  [PSAF ¶¶ 28, 29; DRPSAF ¶¶ 28, 29].  Nelson testified that she is sure she spoke to Howard about Younge's performance issues prior to her termination and prior to the pregnancy announcement, but Nelson admits she was not aware of any discussion of terminating Younge before Younge announced her pregnancy.  [PSAF ¶ 30; DRPSAF ¶ 30; Nelson Dep. at 29–30, 38–39].  Howard hired Ms. Becker-Brown, who was not pregnant, to replace Younge.  [PSAF ¶ 27; DRPSAF ¶ 27].

## IV.  **DISCUSSION**

Younge asserts a claim for pregnancy discrimination under Title VII, as amended by the Pregnancy Discrimination Act, and Younge has abandoned her retaliation claim.  Defendant argues that Younge was not an "employee" of

Defendant within the meaning of Title VII based on the "personal staff" exemption and that she therefore is not entitled to any relief in connection with the pregnancy discrimination claim. I agree with Defendant and will recommend that summary judgment be granted.

### A. "Personal Staff" Exemption

Title VII prohibits employment discrimination with respect to an employee's compensation, terms, conditions, or privileges of employment, because of the individual's sex. 42 U.S.C. § 2000e-2(a)(1). The determination of whether an individual should be considered an 'employee' under Title VII "is a question of federal, rather than of state, law; it is to be ascertained through consideration of the statutory language of the Act, its legislative history, existing federal case law, and the particular circumstances of the case at hand." *EEOC v. Reno*, 758 F.2d 581, 584 (11th Cir. 1985) (citing *Calderon v. Martin Cnty.*, 639 F.2d 271, 272–73 (5th Cir., Unit B, 1981)). However, "[s]tate law is relevant insofar as it describes the plaintiff's position, including [her] duties and the way [s]he is hired, supervised and fired." *Id.* (citing *Calderon*, 639 F.2d at 273).

Title VII defines the term "employee" as follows:

[A]n individual employed by an employer, except that the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters

thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office. . . .

42 U.S.C. § 2000e(f).  Defendant contends that Younge was chosen by Howard, an elected official,[8] to be on his personal staff.

Title VII does not define the term "personal staff."  "Courts have construed the personal staff exemption narrowly, however, because 'Congress intended . . . the . . . exception to apply only to those individuals who are in highly intimate and sensitive positions of responsibility on the staff of the elected official.' " *Milliones v. Fulton Cnty. Gov't*, No. 1:12-cv-3321-TWT, 2013 WL 2445206, at *4 (N.D. Ga. June 5, 2013) (quoting *Teneyuca v. Bexar Cnty.*, 767 F.2d 148, 150 (5th Cir. 1985)). "The term 'personal staff' 'embodies the general and traditional proposition that positions of confidentiality, policy-making, or acting and speaking on behalf of the chief are truly different from other kinds of employment.'" *Milliones*, 2013 WL 2445206, at *4 (quoting *Shahar v. Bowers*, 114 F.3d 1097, 1104 n.15 (11th Cir. 1997)).

---

[8] The District Attorney for a judicial circuit is an elected position in Georgia. *See* O.C.G.A. § 15-18-3(1).  There is thus no dispute that Howard was an elected official.

"The determination of whether an individual is part of an elected official's personal staff involves a 'highly factual' inquiry that focuses on 'the nature and circumstances of the employment relationship between the complaining individual and the elected official. . . .'" *Milliones*, 2013 WL 2445206, at *4 (quoting *Teneyuca*, 767 F.2d at 152).   As mentioned previously, when making such determinations, courts have considered the following non-exhaustive list of factors:

> (1) Whether the elected official has plenary powers of appointment and removal, (2) whether the person in the position at issue is personally accountable to only that elected official, (3) whether the person in the position at issue represents the elected official in the eyes of the public, (4) whether the elected official exercises a considerable amount of control over the position, (5) the level of the position within the organization's chain of command, and (6) the actual intimacy of the working relationship between the elected official and the person filling the position.

*Laurie v. Ala. Ct. of Crim. App.*, 88 F. Supp. 2d 1334, 1338 (M.D. Ala. 2000), *aff'd*, 256 F.3d 1266 (11th Cir. 2001) (citations and internal alterations omitted); *Milliones*, 2013 WL 2445206, at *4.   "[C]ase law indicates that the sixth factor is the most important factor." *Laurie*, 88 F. Supp. 2d at 1338 (citing cases).

The exemption allows a defendant to avoid liability even if a plaintiff meets her burden of proof under Title VII. *Oden*, 246 F.3d at 467. "The defendant bears the initial burden of demonstrating that the personal staff exception applies." *Id.* (citing *Nichols*, 921 F.2d at 1111).   If the defendant meets that burden, the burden

then shifts to the plaintiff "to demonstrate that a material issue of fact existed as to the true nature of her relationship with the elected official in question, i.e., that it was in fact other than that implied by the defendant's evidence." *Nichols*, 921 F.2d at 1111 (citing *Teneyuca*, 767 F.2d at 152). If "the plaintiff fail[s] to make a sufficient showing of an issue of material fact," then summary judgment is appropriate. *Nichols*, 921 F.3d at 111 (citing *Teneyuca*, 767 F.2d at 153); *see also Watts v. Bibb Cnty.*, No. 5:08–CV–413 (CAR), 2010 WL 3937397, at *8 (M.D. Ga. Sept. 30, 2010) (While "the exemption[] [is] highly fact [dependent], summary judgment may be appropriate when there is no genuine issue of material fact as to the applicability of the relevant factors.").

Construing the facts in the light most favorable to Younge, I easily find, largely based on Younge's own testimony, that she was a member of Howard's personal staff. Significantly, five of the six factors weigh heavily in favor of the applicability of the exemption. I will address each factor in turn below.

1. Howard's Plenary Powers of Appointment and Removal

Pursuant to Georgia statutory law, Howard had wide latitude to appoint and remove District Attorney's Office employees. "Georgia statutory code expressly empowers the District Attorney to hire and discharge personnel and to 'define the duties and fix the title of any attorney or other employee of the district attorney's

office.'" *Peppers v. Cobb Cnty., Ga.*, 835 F.3d 1289, 1299 (11th Cir. 2016) (citing O.C.G.A. § 15–18–20(a)).[9]   However, Section 15-18-20(a) also provides that the District Attorney's employment of "additional assistant district attorneys, deputy district attorneys, or other attorneys, investigators, paraprofessionals, clerical assistants, victim and witness assistance personnel, and *other employees*" is "as may be provided for by local law or as may be authorized by the governing authority of the county or counties comprising the judicial circuit."   O.C.G.A. § 15–18–20(a). This qualifying language, as applied in Fulton County, is the subject matter about which Plaintiff's counsel stated he would have taken discovery, if he had been provided earlier notice of the "personal staff" exemption being at issue.   This statute

---

[9] Defendant argued, without explanation, that O.C.G.A. §§ 15-18-19 and 15-18-20.1 governed Howard's appointment and removal powers.   The statutory provisions cited by Defendant apply to state-paid personnel employed by district attorneys.   Defendant cites no evidence that Younge was paid by the state or pursuant to a contract that Fulton County had "with the Prosecuting Attorneys' Council of the State of Georgia to provide such additional personnel in the same manner as is provided for state paid personnel." O.C.G.A. §§ 15-18-20.1.   There likewise is no evidence that Younge was considered a state employee.   To the contrary, there is evidence that Younge's position was in Fulton County's system, her employment paperwork was processed by Fulton County, Younge received Fulton County benefits, Younge participated in Fulton County orientation, and Younge was a Fulton County employee. [Younge Dep. at 27, 29, 31, 32, 130].   Therefore, based upon my review of the statutory provisions, the case law analyzing these statutory provisions, and the evidence of record, I conclude that O.C.G.A. § 15-18-20 is the statute that governs.

further provides that "[p]ersonnel employed by the district attorney . . . shall serve at the pleasure of the district attorney and shall be compensated by the county or counties comprising the judicial circuit, the manner and amount of compensation to be paid to be fixed either by local Act or by the district attorney with the approval of the county or counties comprising the judicial circuit." *Id.* § 15-18-20(b).  Notably, Younge's job offer stated that it was "contingent upon the approval of the Fulton County Personnel Department and Finance Department . . . ."  [Howard Decl., Ex. A-3, Job Offer].

Based on the above statutory framework, it appears that Howard had plenary powers to select persons for employment and to make termination decisions, but the actual hiring of a candidate, once selected, was subject to local laws or the authorization of the governing authority of Fulton County.  Moreover, the salary at which a selected candidate was hired was subject to the approval of Fulton County. Of course, in this case, Younge ultimately was able to be hired at a salary a little less than what was stated on the Job Description but only after Younge's formal job title in the Fulton County system was altered and only after Howard took and signed an Official Oath in Support of Hiring Personal Staff, swearing that he had "reviewed the definition of 'personal staff' contained in the Fulton County Personnel Policies and Procedures" and that he intended to hire Younge as a Deputy Chief of Staff "to

33

be a member of [his] personal staff." [Howard Decl., Ex. A-4, Official Oath in Support of Hiring Personal Staff].

Viewing these facts in the light most favorable to Younge, I find that Howard had complete and absolute power to remove employees but not plenary power to appoint individuals for employment. While Howard had sole and absolute authority to select individuals for employment, Howard's hiring power was subject to local laws or the authorization and approval of the governing authority of Fulton County. Accordingly, I conclude that factor one weighs neither in favor nor against applying the "personal staff" exemption in this case.

2. Younge's Personal Accountability to Only Howard

With respect to the second factor, Defendant points to an abundance of evidence that Younge was accountable to only Howard. As an initial matter, everyone deposed in this case, including Younge, consistently testified that Howard was Younge's only supervisor. [Younge Dep. at 62, 124, 133; Howard Dep. at 24; Nelson Dep. at 39]. Additionally, as Defendant highlights in its statement of facts and brief, Younge testified in detail regarding her accountability to and close working relationship with Howard:

- she met with Howard every day;
- if Howard "needed something done, [she] would handle it";

34

- she would discuss the progress of initiatives she was overseeing with Howard, "All day every day";

- she had meetings with Howard "all the time" and, as a member of his personal staff, she "was in and out of his office because [the personal staff] were . . . the essential folks;

- she did not need to make appointments to see Howard because she "was literally his go-to person for almost everything," and she was "one of the few on staff that was just able to walk into his office at any time";

- "most folks would need to schedule an appointment or . . . would request to see him through his executive assistant.  But [she] had kind of an open-door access to him";

[Doc. 104-1 at 7–8].

Howard testified that he was Younge's immediate supervisor and that he supervised members of his personal staff, like Younge, "personally and directly." [Howard Dep. at 15].  He "closely directed" these employees.  [*Id.*].  Howard testified that Younge came to his office "several times a day" and explained that they typically would have an early-morning conversation to "talk about the activities for that day."  [*Id.* at 95].  "[A]t the end of the day [they] would generally sort of summarize what had gone on that day and what [they] were planning to do the next day or the immediate future."  [*Id.*].

Moreover, when Howard signed the Official Oath in Support of Hiring Personal Staff, he represented, among other things, that he had reviewed the definition of "personal staff" as set forth in the Fulton County Personnel Policies and

Procedures and that Younge would be a member of his personal staff.  The Fulton County Personnel Policies and Procedures define "Personal staff of elected officials" as "any person who is chosen, appointed and/or hired by a person elected to public office for Fulton County ("elected official") to be on such elected official's personal staff and who is *directly supervised and personally accountable to only that elected official.*"       Fulton     County     Personnel     Policies     and     Procedures, https://www.fultoncountyga.gov/for-employees/policies-and-procedures  (Dec.  12, 2022, 8:00 AM) (emphasis added).  "'[W]hen a job includes this level of personal accountability to one elected official, it is precisely the sort of job Congress envisioned to be within the 'personal staff' of that official and thus exempt from Title VII.'"  *Owens v. Rush*, 654 F.2d 1370, 1376 (10th Cir. 1981) (quoting *Ramirez v. San Mateo Cnty.*, 639 F.2d 509, 513 (9th Cir. 1981)).

Attempting to demonstrate that she was not accountable only to Howard or to at least create an issue of material fact as to this issue, Younge points to testimony that she ranked under Chief of Staff Nelson, and that she worked on the budget with Nelson and occasionally took direction from her.  [Doc. 109 at 9–10; Younge Decl. ¶¶ 3, 33; Grimes Decl. ¶ 5].  During oral argument, Plaintiff's counsel stressed that Younge was the "deputy chief," which he argued definitively showed that she reported to Nelson, the chief.

With respect to the budget, Younge avers that she submitted work to Nelson and would take direction from her to obtain information from others to put into the budget. [Younge Dep. ¶ 33]. While Younge may have occasionally taken direction from Nelson on discrete tasks, there is no evidence that Younge was *accountable* to Nelson or that she was obligated to answer to her. To the contrary, both Howard and Nelson rejected the suggestion by Plaintiff's counsel during their respective depositions that Nelson was Younge's supervisor or that Younge was Nelson's subordinate. [Howard Dep. at 24; Nelson Dep. at 39]. If Younge was aware of any particular situation in which Younge found herself directly accountable to Nelson, Younge could have included that example in her declaration filed in opposition to the motion for summary judgment. In my view, Younge's failure to come forward with any such specific examples further demonstrates that she was accountable only to Howard.

Hence, while Younge was ranked under Nelson and occasionally worked with her on the budget, I conclude that there is no genuine dispute that Younge was personally accountable only to Howard and that Younge is precisely the type of individual that Title VII was not designed to cover. *See Hemminghaus v. Mo.*, 756 F.3d 1100, 1108 (8th Cir. 2014) (holding that the plaintiff, who was a court reporter, was personally accountable only to the elected judge who appointed her to her

position, even though the court reporter occasionally transcribed testimony at the request of attorneys and occasionally worked for other judges); *cf. Dubisar-Dewberry v. Dist. Attorney's Office of the Twelfth Judicial Circuit of the State of Ala.*, 927 F. Supp. 1479, 1485 (M.D. Ala. 1996) (applying personal staff exemption and "find[ing] little significance in the fact that [the plaintiff] answered to not only the District Attorney, but also to the Chief Deputy District Attorney, the Chief Investigator, and the Chief Administrative Assistant."). This second factor weighs heavily in favor of finding that Younge was a member of Howard's personal staff and that she was not an employee within the meaning of Title VII.

### 3. Younge's Representation of Howard in Eyes of the Public

Regarding the third factor, Howard testified that Younge was a key member of his personal staff and that he saw Younge as someone who spoke for him. [Howard Dep. at 42, 110]. Moreover, the unrefuted evidence of record is that Younge represented Howard to the public more than any other member of Howard's personal staff. [Howard Decl. ¶ 5]. Even Younge acknowledged that she was "in contact with a lot of persons in the community on behalf of the DA's Office." [Younge Dep. at 39]. Younge also testified: "Any dignitaries or anybody—any visitors that came to the office and had meetings with the DA, I was in. Sometimes

that was in addition to the chief of staff and sometimes that was without her."  [*Id.* at 34].

> As one district court in the Eleventh Circuit aptly noted:
>
> As a matter of common knowledge and experience we know that [a district attorney] gets public credit for the good job done and impression made by his assistants and gets public criticism for the poor performance or impression made by his assistants.  At election time he is judged by what he and his assistants have done.

*Wall v. Coleman*, 393 F. Supp. 826, 831 (S.D. Ga. 1975); *see also Shahar v. Bowers*, 114 F.3d 1097, 1104 n.15 (11th Cir. 1997) (stating that the Eleventh Circuit previously held "that assistant state attorneys and the like—lawyers who serve at the pleasure of their policy-making chief—were not employees protected by the statutes, but were members of the personal staff of the chief lawyer") (citing *Reno*, 758 F.2d at 584 and quoting *Wall*, 393 F. Supp. 831).  Consistent with the *Wall* court's statement, Howard averred in his declaration: "Because Plaintiff represented me in the eyes of the community, I was very involved with her work because I knew that my voters would judge me based on the job Plaintiff did implementing our Office's policies and projects."  [Howard Decl. ¶ 7].

Younge contends that she was not permitted to serve in a capacity to represent Howard in the eyes of the public.  [Doc. 109 at 10].  Younge points to testimony that Howard was always present when she met with dignitaries or members of the public.

[Younge Dep. at 34, 35, 36–37; Younge Decl. ¶ 19].   Younge also points to testimony that indicates she did not run any of the meetings.  *See* [Younge Dep. at 36–37].  While Younge testified that she did not run the meetings, she did state that she participated and had a voice in them.  [*Id.* at 37].  Moreover, Howard's presence at meetings, along with Younge, does not show that Younge did not represent Howard in the eyes of the public.  It is certainly conceivable that Howard could have been present at a meeting and the public could have viewed Younge as a representative of Howard at that meeting, too.  Thus, this factor also weighs in favor of finding that the "personal staff" exemption applies.

### 4.  Howard's Control Over the Position

Next, Howard exercised considerable control over Younge's position and her day-to-day activities.  *See Gunaca v. Texas*, 65 F.3d 467, 471 (4th Cir. 1995) (stating that this fourth factor is concerned with the degree of control an elected official "actually exerts over the [plaintiff's] day-to-day activities").  Here, Howard set the agenda for the policies and programs that Younge oversaw.  [DSMF ¶ 15; RSMF ¶ 15; Howard Decl. ¶ 8].  When asked during her deposition how involved Howard was with the programs she oversaw, Younge testified that Howard was "very involved." [Younge Dep. at 42].  Younge further testified that she met with Howard daily and that they discussed the programs "all day every day."  [*Id.* at 43].

According to Younge, Howard would sometimes even send text messages to her work cell phone on the weekends.  [*Id.*].  Howard similarly averred that "[he] was very involved with her work because [he] knew that [his] voters would judge [him] based on the job [Younge] did implementing [the] Office's policies and projects." [Howard Decl. ¶ 7].  Howard testified that he saw or spoke to Younge multiple times every day.  [Howard Dep. at 110].  Based on Howard's constant interaction with Younge and his close oversight of the work Younge performed related to the District Attorney's policies and programs, I find that this fourth factor weighs firmly in favor of finding that Younge was a member of Howard's personal staff.

### 5.   The Level of the Position Within the Chain of Command

The level of Younge's position within the chain of command at the District Attorney's Office also supports the applicability of the "personal staff" exemption. Younge was third in the chain of command for the entire office while employed by Defendant.  [DSMF ¶ 3; RSMF ¶ 3; Younge Decl. ¶ 3; Grimes Decl. ¶ 5; Nelson Dep. at 15; Howard Dep. at 42].  Younge testified that she was in every meeting for "any and every project that had to with the DA's Office."  [Younge Dep. at 34]. Younge further testified:  "Any dignitaries or anybody—any visitors that came to the office and had meetings with the DA, I was in.  Sometimes that was in addition to the chief of staff and sometimes that was without her . . . pretty much the schedule

that DA Paul Howard had, was my schedule." [*Id*].  She testified that she was "pretty much" involved with everything related to the District Attorney's Office and that she was Howard's "go-to person for almost everything."  [*Id.* at 37, 68].  Howard likewise considered Younge a "key member of [his] personal staff" and "a high-ranking part of [his] staff."  [Howard Dep. at 110].  Of significance, too, Younge was the second- or third-highest paid staff member at the District Attorney's Office.  [Howard Decl. ¶ 9].  Hence, the level of Younge's position within the chain of command supports a finding that the "personal staff" exemption applies, and Younge has made no argument to the contrary with respect to this factor.

> 6.  <u>Intimacy of the Working Relationship Between Howard and Younge</u>

Finally, Younge's deposition and declaration testimony both indicate that Younge and Howard had a close working relationship.  While Younge attempts to explain as hyperbole her deposition testimony that she discussed her work with Howard "all day every day," she still acknowledges in her declaration that she and Howard "worked closely together."  [Younge Decl. ¶ 30].  She also avers that he "demanded constant availability around the clock," which is consistent with her deposition testimony that he would send her text messages on the weekends.  [*Id.*; Younge Dep. at 43].  Younge also continues to acknowledge in her declaration that she had "open door access" to Howard and that she "could go into his office and talk

to him about something whenever his door was open, without an appointment."

[Younge Decl. ¶ 31].  This is consistent with Howard's testimony that Younge did

not even need to knock before coming in.  [Howard Dep. at 116].  Of course, one of

Younge's main contentions in the lawsuit is that all of this changed after she notified

Howard of her pregnancy, but there is no dispute that Younge had "easy access" to

Howard and a "close day-to-day working relationship" with Howard for the majority

of the time that she was employed by Defendant and working on Howard's staff.

[Younge Decl. ¶ 31].  Thus, I agree with Defendant that Younge's working

relationship with Howard was the kind of "highly intimate and sensitive position[]

of responsibility on the staff of [an] elected official" that Congress contemplated

when it enacted the "personal staff" exemption.  *Teneyuca*, 767 F.2d at 152 (quoting

*Owens*, 654 F.2d at 1375).  As the most important factor, this sixth factor makes it

abundantly clear that the "personal staff" exemption applies in this case.  *Laurie*, 88

F. Supp. 2d at 1338.

### 7.  *Conclusion Regarding "Personal Staff" Exemption*

In sum, there is no genuine issue of material fact as to the applicability of the

"personal staff" exemption factors.  Five out of the six factors decisively weigh in

favor of applying the exemption, including the most important factor (i.e., intimacy

of the working relationship), and no reasonable jury could reach a different

conclusion.  As a result, I will recommend that summary judgment be granted on Younge's pregnancy discrimination claim.

### B. Pregnancy Discrimination

I have concluded that (1) the "personal staff" exemption should not be deemed waived by Defendant's failure to plead it or otherwise formally raise it; and (2) there is no fact issue as to whether the "personal staff" exemption applies to bar Title VII relief in this case.  Under these circumstances, additional analysis of the remaining issue—i.e., whether there is a material fact dispute as to whether Younge was the victim of pregnancy discrimination—is not necessary.  In the interest of efficiency and thoroughness, however, I will address this final issue so that the district judge will have the benefit of my analysis in the event that he disagrees with my conclusions regarding the "personal staff" exemption.

Under Title VII, as amended by the PDA, "pregnancy, childbirth, or related medical conditions" must be recognized as sex-based characteristics of women. 42 U.S.C. § 2000e(k). "The Pregnancy Discrimination Act has now made clear that, for all Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of sex." *Newport News Shipbuilding and Dry Dock Co. v. EEOC*, 462 U.S. 669, 684 (1983).  "The analysis required for a pregnancy discrimination claim is the same type of analysis used in other Title VII sex

discrimination suits." *Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1320 (11th Cir. 2000).

Where a plaintiff claims discrimination based on circumstantial evidence, courts ordinarily apply the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of discrimination. 411 U.S. at 802–04. Once the plaintiff employee has established a prima facie case, the burden shifts to the defendant employer to proffer a legitimate, nondiscriminatory reason behind the complained-of employment action. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-56 (1981). If the employer proffers a legitimate, nondiscriminatory reason for the employment action, the burden shifts again to the employee to show that the employer's proffered reason is a pretext for a discrimination. *Id.* at 256; *see also Anyanwu v. Brumos Motor Cars, Inc.*, 496 F. App'x 943, 946 (11th Cir. 2012).

Eleventh Circuit authority holds that "the plaintiff will always survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). A triable issue that must go before a jury exists if, "viewed in a light most favorable to the plaintiff, [the record] presents

'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Id.* Younge maintains that a convincing mosaic of circumstantial evidence demonstrating intentional discrimination by Howard exists in this case. But for my opinion that the "personal staff" exemption precludes Younge from obtaining Title VII relief, I agree that she has presented a convincing mosaic of circumstantial evidence creating triable issues of fact as to Howard's discriminatory intent.

Among other evidence, there is evidence that Howard began treating Younge differently after she announced that she was pregnant, including by excluding her from meetings, reassigning some of her duties, and limiting the usual access that she had to Howard. [Younge Decl. ¶¶ 23, 24, 28, 29, 30; Young Dep. at 83–84, 87–88, 98–99, 102]. The timing of the termination meeting—only two weeks after the pregnancy announcement—also suggests discriminatory intent. *Wolchok v. Law Offices of Gary Martin Hays & Assocs., P.C.*, No. 1:07-cv-765-CC, 2008 WL 11336109, at *4 (N.D. Ga. Aug. 27, 2008) ("Close temporal proximity between a pregnant employee's announcement of her pregnancy and the termination of the employee may be used to demonstrate pretext."). Furthermore, while Howard heavily relied upon complaints from other District Attorney's Office staff members as his basis for terminating Younge, there is testimony from Younge that Howard

46

never brought these issues to her attention before she notified Howard of her pregnancy.  [Younge Decl. ¶¶ 25–27; Younge Dep. at 60, 115–16].  Significantly, too, it is undisputed that none of these complaints were documented and placed in Younge's personnel file until weeks after she was terminated.  [Nelson Dep. at 13– 16; Grimes Decl. ¶¶ 16–17, 21; Doc. 109-10, Post-Termination Statements].  Even Chief of Staff Nelson, Howard's top advisor on staffing issues, testified that she was not aware of any discussion of terminating Younge prior to the time that Younge announced she was pregnant.  [Nelson Dep. at 38–39].  Finally, it is undisputed that Younge was replaced by a non-pregnant employee.  [PSAF ¶ 27; DRPSAF ¶ 27; Howard Dep. at 16–17, 100–01].  Therefore, if the district judge concludes that the "personal staff" exemption is waived or does not apply, the evidence I have summarized above warrants denying summary judgment and permitting Younge's pregnancy discrimination claim to go before a jury.

## V.   <u>CONCLUSION</u>

Based on the foregoing, I conclude that Younge is not an "employee" within the meaning of Title VII and that a Title VII remedy is not available in this case.  I **RECOMMEND** that Defendant's Motion for Summary Judgment be **GRANTED**.

As this is a Final Report and Recommendation, there is nothing further in this

action pending before the undersigned.  Accordingly, the Clerk is **DIRECTED** to

terminate the reference of this matter to the undersigned.

     **SO RECOMMENDED** this 12th day of December, 2022.

Catherine M. Salinas
United States Magistrate Judge